NEWPORT NEWS SHIPBUILDING
AND DRY DOCK COMPANY,
Plaintiff,

v.

UNITED STATES DEPARTMENT
OF the NAVY,

Lawrence H. Garrett, III, Secretary,
Department of the Navy,

and

General Dynamics Corp. (Electric
Boat Division), Defendants.

Civ. A. No. 91–64–NN.

United States District Court,
E.D. Virginia,
Newport News Division.

July 31, 1991.

D. Arthur Kelsey Jr., Gregory N. Stillman, Hunton & Williams, Norfolk, Va., for Newport News Shipbuilding & Dry Dock Co.

Craig S. King, Gen. Counsel Dept. of Navy, Washington, D.C., John Phillip Krajewski, Office of U.S. Atty., Norfolk, Va., for U.S. Dept. of Navy and Lawrence H. Garrett, III, Secretary Dept. of Navy.

Conrad Moss Shumadine, Willcox & Savage, Norfolk, Va., C. Stanley Dees, Thomas C. Papson, J. Keith Burt, McKenna & Cuneo, Washington, D.C., for General Dynamics Corp., Electric Boat Div.

### OPINION AND ORDER

DOUMAR, District Judge.

In November 1990, acting pursuant to the defense appropriations bill for fiscal

year (FY) 1991, the Navy issued a solicitation for bids for the contract to construct the SSN–22 Seawolf submarine, the second ship in the Seawolf program.[1] The plaintiff, Newport News Shipbuilding and Drydock Company ("Newport News"), and defendant Electric Boat Division of General Dynamics Corporation ("Electric Boat") submitted bids for the contract. On May 3, 1991, the Navy awarded the contract to Electric Boat.

■ This suit challenges that award, pursuant to provisions of the Administrative Procedures Act, 5 U.S.C. §§ 701–706. Newport News requests a declaratory judgment and an injunction to terminate the award made to Electric Boat and to award the contract to Newport News, or, in the alternative, to resolicit bids for the contract. The plaintiff has standing under these facts to challenge the contract award. *Motor Coach Industries, Inc. v. Dole*, 725 F.2d 958 (4th Cir.1984); *William F. Wilke, Inc. v. Department of the Army*, 485 F.2d 180 (4th Cir.1973).

A hearing on plaintiff's motion for a temporary restraining order was held on May 7, 1991, at which counsel for Newport News and the Navy were present. A temporary restraining order was issued and Electric Boat was ordered joined as a defendant. On May 17, 1991, another hearing was held at which all parties, including Electric Boat, were present and the temporary restraining order was extended for ten days. Between May 17 and May 22, the Court conducted four days of evidentiary hearings and argument on plaintiff's motion for a preliminary injunction. The preliminary injunction was ordered on May 24, and the parties returned on May 29 for further hearing on the terms of the preliminary injunction and the amount of the bond. The Court's order of a preliminary injunction was modified by an order of May 29, 1991, and further explained by an opinion of May 31, 1991.

On June 24, 1991, all parties submitted a stipulation that there would be no further evidentiary hearings, and agreed that the Court's further consideration of the case should be limited to the administrative record, the proceedings already held, the evidentiary materials already filed with the Court or filed with the stipulation, and final argument. Final argument was held July 11, 1991, and the last submission from the parties was received July 22, 1991.

The Court declares that the award of the contract to construct the SSN–22 to Electric Boat violated the statutes and regulations of the United States and the terms of the solicitation, and is void and of no effect. The defendants are hereby ordered to conduct a resolicitation of bids, with the terms and conditions of the resolicitation such as to place the parties in the same relative position that they occupied when the Navy received the bids on January 8, 1991. The parties are further directed to proffer to the Court a proposed resolicitation in compliance with the terms of this order for approval of this Court within fourteen days of the date hereof. The Navy is directed to consider any award of the contract in accordance with law. The defendants are enjoined from proceeding with the contract illegally awarded May 3, 1991, which is the subject of this suit.

## INTRODUCTION

The Court readopts its opinion of May 31, 1991, as modified by its order of July 12, 1991.

A disappointed bidder challenging award of a government contract "bear[s] a heavy burden of showing either that (1) the procurement official's decision on matters committed primarily to its own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes and regulations." *Choctaw Mfg. Co., Inc. v. United States*, 761 F.2d 609, 616 (11th Cir. 1985) (*quoting Kinnett Dairies, Inc. v.*

---

1. "SSN–21" refers to the lead ship of the Seawolf program, and also to the Seawolf program as a whole. The second ship in the Seawolf program is referred to as either the SSN–22 or the FY (fiscal year) 91 ship; the contract for its construction, the subject of this case, is referred to as the SSN–22 contract or the FY 91 contract. The SSN–22 is a sister ship to the original SSN–21, as will be the SSN–23, or FY 92 ship, and so on.

*Farrow,* 580 F.2d 1260, 1271 (5th Cir.1978) (*quoting in turn Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir. 1973))).

With regard to the first prong, considerable testimony was received on the rationality of the decision to award the FY 91 contract to Electric Boat. Analysis of the rationality of the decision in this case depends upon analysis of the second prong. If the award violated the statutes, regulations, or the terms of the solicitation, then it would not be rational.

The second prong of the *Choctaw Manufacturing* test requires that the Court determine whether the award violated objective standards, as set forth by statute, regulation, or the terms of the solicitation itself. The Federal Acquisition Regulation, the specific regulations and statutes governing the Department of Defense, and the 1991 defense authorization and appropriations acts are all involved in this matter.

The findings of fact and the facts set forth, no matter where in this opinion, are found by clear and convincing evidence unless otherwise expressly designated.

### ANALYSIS

#### 1. Background prior to the 1991 Appropriations Act

The Seawolf is a complex and expensive nuclear-powered submarine requiring five years to build. Newport News and Electric Boat are the only companies in the United States presently capable of constructing nuclear-powered submarines. The cost of gearing up for production of a nuclear submarine from scratch is so prohibitive that it is highly unlikely that a third source will ever be established in peacetime. If either Electric Boat or Newport News were to cease new construction of Seawolf-class submarines while the other continued production, the latter would enjoy decided if not decisive competitive advantages in any subsequent price competition for a new contract.

For the last twenty years both shipyards have been engaged in the construction of the Los Angeles or SSN 688 class of attack submarines. In the last decade Electric Boat has been the sole source of Trident ballistic missile submarines. Both the Los Angeles and Trident programs are being terminated, and no more submarines of either class will be constructed after the completion in the mid–1990s of those presently in construction at both yards.

In the 1980s, the Navy began development of a new class of attack submarine called the Seawolf or SSN–21 class. *See* A.R. Tabs 1, 8.[2] Because the Los Angeles and Trident programs are phasing out, the Seawolf program is obviously crucial to the continued vitality, if not existence, of the two shipyards as builders of submarines.

In May 1988, the Navy promulgated Seawolf Class Acquisition Plan Revision A for the Seawolf program. A.R. Tab 1. This document stressed the importance of maintaining the submarine construction capability of both shipyards and the importance of competition between the two yards. The Acquisition Plan stated that "[t]he acquisition strategy for SEAWOLF emphasizes competition," and provided that "[b]oth EB and NNS will compete for lead ship construction and all subsequent construction." A.R. Tab 1 at 18. The Plan went on to state:

> NNS and EB presently comprise the total industrial base for nuclear attack submarine design and construction, and their continued participation in attack submarine programs is essential to the nation's ability to respond to national emergencies.

A.R. Tab 1 at 34.

In 1989, the Navy solicited bids for the contract to construct the lead ship in the Seawolf class, or the SSN–21, and awarded the contract to Electric Boat.

On November 16, 1989, the Navy promulgated Revision B to the Seawolf Class Ac-

**2.** The record in this case consists for the most part of the administrative record and exhibits received at the hearing on the preliminary injunction. Documents in the administrative record ("A.R.") are identified by tab number. Citations to page numbers in the administrative record are to Bates numbers. Exhibits ("Ex.") are referred to by their number.

quisition Plan. A.R. Tab 2. Revision B reiterated that the Seawolf acquisition strategy emphasizes competition, and stated: "In order to provide for the Navy's goal of competition between the two shipbuilders, one of the two FY 1991 ships will be directed to NNS to establish the second source." A.R. Tab 2 at 56. This revision authorized a sole-source award to Newport News on a negotiated basis. However, the Navy and Newport News were unable to arrive at an acceptable price before enactment of the 1991 Defense Appropriations Act obviated the negotiations.

### 2. 1991 Defense Authorization and Appropriations Acts

To understand the 1991 Defense Appropriations Act and how it applies in this case, one must be aware of the matters surrounding it. As with any major defense acquisition, there must be an approved acquisition strategy, and contracts must be awarded pursuant to that strategy. 10 U.S.C. § 2305a.[3] The Seawolf program is such a major acquisition, and the Appropriations Act itself refers to the acquisition strategy.

Prior to passage of the appropriations act, Congress enacted the 1991 Defense Authorization Act, Pub.L. No. 101–510, 104 Stat. 1485, 1498 (1990), which authorized some $2 billion for the Seawolf program. The House Armed Services Committee Report on the authorization bill reads as follows:

> Since there is only one nuclear ship construction yard building the Trident submarine, and that same yard won the competition for the lead ship of the Sea-

wolf, the Navy should try to bring the other nuclear submarine construction yard into the Seawolf program as a second source, so that the opportunity for future competition can be protected.

> To avoid undercutting the results of the previously conducted competition for the construction of the first Seawolf, the committee believes that the Navy should use the same terms, conditions, and price included in the lead ship construction contract for the second Seawolf ...

> *The committee expects that the Navy will proceed with its plan to bring the second submarine builder into the SSN–21 program with the award of the second ship of the program.* The committee recommendation recognizes that a continuity of work to maintain this community is necessary if highly capable nuclear powered submarines are to be constructed in the near future.

H.R.Rep. No. 101–665, 101st Cong., 2d Sess. 70 (1990) (emphasis added). In its report on the same authorization act, the Senate Armed Services Committee stated:

> ... The committee believes that competition between two yards in the construction of nuclear-powered attack submarines is important to the Nation and should not be given up absent a clear showing that such action is in the long-term best interests of the United States....

> The case for sole-sourcing these ships has not yet been made, and competition in the building of attack submarines may better serve the nation's interests. Much of the argument for eliminating competition rests on the claim that some

---

**3.** Title 10, Section 2305a(a) of the U.S.Code states:

(1) The Secretary of Defense may not begin full-scale development under a major program until—

(A) the Secretary prepares an acquisition strategy for the program; and

(B) the Secretary submits to the Committees on Armed Services of the Senate and House of Representatives a report describing the acquisition strategy for that program.

(2) The report required by paragraph (1)(B) shall be submitted not later than the date of the submission of the President's budget to Congress of the fiscal year for which the initial request is made for appropriations for full-scale development of the program.

(3) If the Secretary proposes to revise an acquisition strategy prepared under paragraph (1) after the report on that strategy is submitted under that paragraph, the Secretary shall submit to the committees a report describing the proposed revision. Such a revision may not be implemented until 60 days after the date on which the report on the revision is received by those committees.

(4) The Secretary shall ensure that contracts for each major program are awarded in accordance with the acquisition strategy for such program.

overhead costs are duplicative and could be eliminated. But these potential savings must be balanced against the positive stimulus for quality and cost reduction which a well-structured competition can provide. . . .

The committee doubts that a threat by the government to re-introduce competition by a second submarine yard would be convincing or persuasive in lowering the cost or improving the performance at a sole-source shipyard. A decision by the government to exclude a second yard from building Seawolf class submarines would soon become irreversible. The government would not be able to quickly reconstitute capability for building nuclear-powered submarines at a second yard for several reasons: the absence of skilled labor; environmental regulations governing construction of nuclear power plants; high capital investment; and the absence of a subcontractor base.

To ensure a full consideration of all these factors, the committee recommends a provision that would direct the Secretary of Defense not to reduce the industrial base for submarine construction from two shipyards to one until he provides a study which examines submarine industrial base requirements, the effects of such a reduction in the number of submarine construction yards, and whether such a reduction is in the long-term best interests of our national security. The Secretary of Defense is directed to ensure that no action is taken prior to May 1, 1991, which would have the effect of limiting construction of any class of attack submarines to a single shipyard.

S.Rep. No. 101–384, 101st Cong., 2d Sess. 61–62 (1990).

The authorization bill declined to express "a preference for any particular method of contracting for the SSN–21 submarine authorized by this Act." Pub.L. No. 101–510, § 154, 104 Stat. 1505. However, it was clear from Congress that competition was desired and that the Navy should take no action prior to May 1, 1991, which would limit the construction of any class of submarines to one shipyard.

The 1991 Defense Appropriations Act appropriated $1,783,000,000 to the SSN–21 attack submarine program

*Provided,* That the Secretary of Defense shall ensure that the Secretary of the Navy considers all available options under applicable statutes and regulations in the development and promulgation of the acquisition strategy for the SSN–21: *Provided further,* That the Secretary of the Navy shall compete the award of the next SSN–21 submarine: *Provided further,* That the Secretary of the Navy shall consider all applicable factors in making an award including the desirability of a competitive acquisition strategy for the entire SSN–21 program[.]

The legislative history indicates that Congress provided clear direction to the Navy on Congress's desire to maintain two competing shipyards in the construction of nuclear submarines. The Conference Committee Report on the appropriations bill, referring to the second proviso directing the Secretary of the Navy to compete the award for the next Seawolf, states:

In carrying out this competition the Secretary should consider the submarine industrial base and cost factors in determining the winner of the submarine competition.

H.R.Conf.Rep. No. 938, 101st Cong., 2d Sess. 82–83 (1990). Congress thus intended the Navy to consider both cost and the submarine industrial mobilization base factors in awarding the SSN–22 contract. The concept of "industrial mobilization" is discussed at length below and in the Court's previous opinion of May 31; briefly, for the purposes of this solicitation it refers to the maintenance of two shipbuilders in the Seawolf program. It also refers to a justification for awarding a government contract on a non-competitive basis.

The first proviso of the Appropriations Act required the promulgation of an acquisition strategy for the Seawolf program. It is clear, and the Court finds, that Congress intended that an overall acquisition plan for the Seawolf program be promulgated prior to award of the SSN–22 contract, and that the SSN–22 award be made

in accordance with that plan. *See also* 10 U.S.C. § 2305a, *supra* note 3. This requires a determination of whether there was a competitive acquisition strategy promulgated for the Seawolf class and whether the award of the SSN–22 (FY 91) was made pursuant to that strategy.

In May 1988 the Navy had issued Seawolf Class Acquisition Plan Revision A for the Seawolf program (A.R. Tab 1), which apparently represented an acquisition strategy for the program as a whole. As indicated above, this document described the Seawolf acquisition strategy as one providing for competition between the two shipyards throughout the life of the program. A.R. Tab 1 at 18. The Navy's award of the SSN–22 contract to Electric Boat would fly in the face of this strategy, as it results in a monopoly rather than providing for competition. Competition requires more than one producer. The Court finds by clear and convincing evidence that award of the SSN–22 to Electric Boat does create a monopoly, and competition in the Seawolf program as a whole will cease if EB retains the SSN–22 contract.

On November 9, 1990, after passage of the Appropriations Act, a particular acquisition strategy for the SSN–22 was proposed. A.R. Tab 5. It was designed to allow the maintenance of two shipbuilders of nuclear submarines. This strategy proposed a flexible approach to permit a mobilization base award (i.e., an award establishing Newport News as the second source) but only at a price equal to or less than the price of the lead ship contract.[4] It also stated that the acquisition plan "allows straight competition if a mobilization base award cannot be made." A.R. Tab 5 at 65. Accompanying the strategy was a proposed solicitation cover letter, which will be further discussed below.

Pursuant to the Navy's strategy of November 9, 1990, the Navy could make a mobilization base award to Newport News, or could award the contract to Electric Boat on the basis of price alone. This strategy was reviewed on January 11, 1991, by the Defense Acquisition Board

(DAB), an advisory board concerned with major defense acquisition issues and chaired by the Under Secretary of Defense for Acquisition. This strategy was approved. In an Acquisition Decision Memorandum (ADM) dated February 15, Acting Under Secretary Donald J. Yockey stated to the Secretary of the Navy: "You can exercise your authority to award the FY 91 ship [SSN–22] contract for one ship." A.R. Tab 17 at 510.

Thus, as of February 15, the Navy could have awarded the contract to either Electric Boat or Newport News. This would have been in compliance with the SSN–22 acquisition plan, as well as the competitive acquisition strategy envisioned by Congress. The February 15 ADM also indicated that the future SSN–*23* could be awarded only after certain certifications and an approval were obtained.

On January 8, 1991, the bids were received. On January 30 the Source Selection Advisory Council (SSAC), a staff committee evaluating the SSN–22 competition, submitted its Proposal Analysis Report to Rear Admiral Millard S. Firebaugh, the Seawolf program manager. A.R. Tab 15. This report stated that Electric Boat bid approximately $615 million, and Newport News $688 million. Electric Boat was thus the low bidder on price by about $73 million. A.R. Tab 15 at 1038. However, the SSAC also concluded that

> if EB receives this award, we believe EB may freeze NNS out of the SEAWOLF construction program due to competitive advantage and budgetary limitations.

The SSAC recommended that an industrial mobilization award of the SSN–22 (FY 91) contract be made to Newport News. A.R. Tab 15 at 1039. At the same time, the SSAC concluded that Electric Boat needed to build at least one submarine per year to remain viable, and recommended that the Navy award an advanced acquisition contract for the SSN–23 (FY 92) to Electric Boat.

On February 11, Admiral Firebaugh proposed to the Secretary of the Navy that a

---

**4.** It also indicated that the Appropriations Act    was ambiguous.

two-ship award be made, whereby the Navy would award the current SSN–22 contract to Newport News and award an advance acquisition contract for the future SSN–23 to Electric Boat. A.R. Tab 16. The Secretary of the Navy approved and forwarded the proposal to Under Secretary of Defense Yockey. A.R. Tab 18.

On March 4, Under Secretary of Defense Yockey reiterated the Secretary of the Navy's authority to award the SSN–22 to whomever he deemed appropriate. A.R. Tab 20 at 513. Again, under the competitive acquisition strategy then in place, the Navy could have awarded the SSN–22 to Newport News on the basis of Industrial Mobilization or to Electric Boat on the basis of price. However, Yockey insisted that the proposed award of the future SSN–23 be put before the DAB since it did not conform to the Acquisition Decision Memorandum of January 15 which allowed award of the SSN–22 pursuant to the competitive acquisition strategy. Acting Under Secretary Yockey's interpretation would require the Navy to obtain permission from the Defense Acquisition Board to proceed with the two-ship award. The fact that the two-ship award involved a long-lead advanced acquisition contract award for the future SSN–23 was the reason advanced by the Government for this requirement. Whether that requirement was or was not valid is not essential to this litigation.

It is here that the matter goes awry. The acquisition strategy then in place, and approved by the Acquisition Decision Memorandum of February 15, allowed a stand-alone award of the SSN–22 to Newport News to establish Newport News as a second source for the Seawolf, thus ensuring future competitiveness. The Navy concedes this. It also allowed an award to Electric Boat based on price. The two-ship award proposal was presented to the DAB on April 15, 1991. On April 16 Yockey

issued an ADM rejecting the award of the SSN–23 to Electric Boat as part of a two-ship award. A.R. Tab 28. The same memorandum told the Navy it could award the contract for the SSN–22 "on the basis of best overall cost and technical approach [i.e., price alone] without further approval." However, as acting Under Secretary Yockey has explained in an affidavit, "if the Navy wished to make [an award to Newport News], based solely on industrial mobilization considerations standing alone, it was required to return to the Defense Acquisition Board to present the basis for the award." Ex. 15 at 7. In a subsequent meeting on April 26 with Assistant Secretary of the Navy Gerald Cann, Yockey reemphasized that if the Navy wanted to make an award of the SSN–22 on the basis of industrial mobilization, it would have to reappear before the DAB and obtain their approval.

This requirement effectively foreclosed the Navy from making an award to Newport News. After April 16, there was no way the Navy could have presented a proposal for an Industrial Mobilization award to the DAB and obtained the DAB's approval before the bids expired on May 8. Time restrictions are clearly provided which would have prevented a meeting of the DAB to review the proposed modification of the Seawolf acquisition strategy until well after May 8. See DOD Directive 5000.2, Sept. 1, 1987 (attached to the Navy's brief in opposition to a permanent injunction);[5] see also 10 U.S.C. § 2305a. Thus, as of May 8, 1991, the Navy, pursuant to the command of the Acting Under Secretary of Defense, could not have awarded the SSN–22 contract to Newport News. It had no choice but to award the contract to Electric Boat.[6]

■ The defendants concede that in January the Navy had the authority to award the SSN–22 contract to Newport News on

---

5. Counsel for defendants indicated in oral argument that if the Navy wanted to consider an award for industrial mobilization to Newport News then it could have requested that EB and NNS extend the time for bids so that the matter could be referred to the DAB.

6. By Congressional intent, the award to Electric Boat should not be made before May 1, 1991, as it would limit construction of the Seawolf class to one builder. See Senate Armed Services Committee Report on the 1991 Defense Authorization Act, above.

the basis of industrial mobilization without approval from Under Secretary Yockey, but that after April 16 it would have had to go back to the DAB in order to make an industrial mobilization award to Newport News. The Navy has not provided any explanation of why or how this change occurred. The Court finds by clear and convincing evidence that for no explicable reason and wholly without rational basis, Yockey arbitrarily and capriciously ordered the SSN–22 to be awarded to Electric Boat on the basis of price alone. In so doing, Yockey completely ignored the acquisition strategy presented to Congress, and the approval of that strategy by the DAB on January 11 as it pertained to the SSN–22, as reflected in the February 15 ADM. By effectively prohibiting the Navy from awarding the contract to Newport News on the basis of industrial mobilization, Yockey arbitrarily and capriciously rejected the right to utilize the strategy, thereby ordering the Navy to violate the Appropriations Act and 10 U.S.C. § 2305a, which required that the contract be awarded pursuant to the acquisition strategy for the Seawolf program.

The Court also finds by clear and convincing evidence that at the time Yockey took these actions, he lacked authority under the Defense Department directives to prevent the Navy from awarding the contract to Newport News on the basis of industrial mobilization. It is only a modification of an acquisition strategy which needs approval of the Under Secretary of Defense for Acquisition. *See* DOD Directive 5000.1 ¶ E.3, Sept. 1, 1987 (attached to the Navy's brief in opposition to a permanent injunction). In this case, Yockey rejected not only the two-ship award, which did represent a modification, but also contravened the terms of an existing strategy by prohibiting the Navy from awarding the contract to Newport News pursuant to that strategy. No other strategy was invoked. Yockey's actions violated the statutes as well as explicit Defense Department directives.

Acting Under Secretary Yockey, in his command denying the Navy the right to award the SSN–22 to Newport News, also ordered the Navy to present an acquisition strategy to the DAB at its August 1991 meeting. A.R. Tab 28. Yockey indicated that this strategy should be competitive for the remainder of the Seawolf program. However, the Court finds as a fact by clear and convincing evidence, in accordance with the Government's evidence, that the award of the SSN–22 to Electric Boat effectively foreclosed future competitiveness. In fact, the Government proffered a great deal of evidence to the effect that industrial mobilization now meant a sole source.

The Court finds that the award of the SSN–22 to Electric Boat on the basis of price alone clearly violates the strategy in effect and adopted by the Defense Acquisition Board at the time the award was made, and clearly violates the Appropriations Act as well as the regulations and directives of the Department of Defense.

### 3. The Solicitation

The second proviso of the Appropriations Act required the Navy to compete the award of the SSN–22 contract. At the same time, the third proviso required the Navy to consider the desirability of a competitive acquisition strategy. Construing these two requirements together, it is clear that Congress did not intend a pure price competition for the SSN–22 contract. A competitive acquisition strategy for the entire program, if adopted, would require establishing Newport News as a second source so that there could be competition over the life of the program. However, it is and was a foregone conclusion that Newport News could not win a competition on price alone.

Edward Campbell, chief executive officer of Newport News, and Admiral Firebaugh both testified that significant one-time start-up costs are incurred during construction of a lead ship, and that such costs are so great that once one shipyard incurs them in building the lead ship, the other yard cannot compete on a cost basis for the next contract, for it still must incur a sub-

stantial portion of the start-up costs.[7] This competitive advantage was referred to as part of the learning curve discussed by Mr. Campbell, and is a matter of simple economics.

At the same time, Newport News could not bid below cost in order to compete with Electric Boat. One of the problems in evaluating a major bid of this nature relates to the target price. The target price is the sum of the contractor's target cost and target profit. If the actual cost exceeds the target cost, the Government and the contractor share those costs at a ratio of 80/20 respectively, up to an amount equal to 130% of target costs. Thereafter the costs are shared 50/50 up to the ceiling price. Only upon exceeding the ceiling price is the contractor obliged to bear the entire cost. Because of this, a bid which is unrealistically low will not be accepted. Under this system Newport News cannot bid below its cost. The bid must include start-up costs. Because Electric Boat has already incurred these costs, Newport News is in a Catch–22 situation. If it bids too low, its bid will be rejected. If it bids as high as is required, it will bid higher than Electric Boat.

Consequently, after Electric Boat won the lead ship contract, Newport News could not compete on price for the SSN–22. Had Congress ordered a pure price competition, it would have been a sham. Clearly, Congress meant for price to be a factor, but not the only factor. If the Navy were to award the contract to Newport News, the award would be based not on price but on Industrial Mobilization. Even under an Industrial Mobilization award, however, the difference in price would have to be considered.

■ As discussed at some length in the Court's previous opinion of May 31, 1991, see pp. 12–14, the phrase "industrial mobilization," in its broad sense, refers to the dedication of the nation's industrial production to meet the government's procurement needs in time of national emergency. The executive branch has extensive powers to direct this effort. See 10 U.S.C. § 4501. "Industrial mobilization base" generally refers to that level of production capacity which will meet the government's defense requirements in time of peace and the expanded requirements in time of war or national emergency. For purposes of a particular procurement decision, "industrial mobilization" refers to an exception to the general requirement that government contracts be awarded on the basis of a price competition. See 10 U.S.C. § 2304(c)(3); 48 C.F.R. § 6.302–3 (1990). The application of Industrial Mobilization as a procurement factor changes with time and circumstances. Its conception in the award of a particular contract is determined by the nature of the product or service, the number of present or prospective sources for that product or service, and the procurement needs of the government as determined by the threat assessment and as confined by budgetary considerations. However, the overriding consideration is war or national emergency. In the case of nuclear submarines, the term has consistently referred to maintenance of two producers. See Opinion of May 31, 1991, at 14.

Congress's directive to consider the desirability of a competitive acquisition strategy mandated that the Navy consider Industrial Mobilization, defined as the maintenance of two submarine producers, as a factor in the award of the SSN–22 contract. In other words, the contract was not to be awarded on the basis of price alone. The price differential would be a consideration but price was not to be the sole consideration. However, the Navy ultimately did award the SSN–22 contract on price alone, and in so doing violated the Appropriations Act.

On November 8, 1990, Admiral Firebaugh requested approval from the Secretary of the Navy to limit competition for

---

7. Some of these start-up costs have already been incurred by Newport News, as it is doing design work and is currently constructing other submarines not of the Seawolf class. However, Electric Boat is also doing design work, and is actually engaged in construction of the lead Seawolf, the SSN–21.

the SSN–22 to Newport News and Electric Boat, pursuant to the Industrial Mobilization exception found at 10 U.S.C. § 2304(c)(3). A.R. Tab 4 (Justification and Approval To Procure Using Other Than Full and Open Competition). The Justification and Approval stated:

NNS and EBDIV presently comprise the total industrial base for nuclear attack submarine construction. Their continued participation in attack submarine programs is essential to ensure the availability of the necessary capabilities to meet both planned ship construction requirements and any surge requirements in the event of national emergency.

. . . . .

The program objective is to buy the SEA-WOLF Class at economical prices while maintaining our industrial base for nuclear submarine construction by having both nuclear qualified shipyards performing construction of such submarines.

*Id.* The Secretary issued his approval on November 20, 1990. A.R. Tab 4 at 63.

On November 9, 1990, Admiral Firebaugh set forth the SSN–22 Acquisition Strategy. A.R. Tab 5. This strategy reiterated the Navy's long-term goal "to maintain two nuclear qualified shipbuilders, and within the SEAWOLF Program, to promote competition between two sources." A.R. Tab 5 at 64. Admiral Firebaugh indicated that the procurement would involve "a competitive acquisition with the Navy reserving the right to allocate, if necessary, to maintain the mobilization base." *Id.* Admiral Firebaugh also indicated his intention to advise the shipyards "that for the mobilization base requirement to be considered, a potential second source's proposal may not exceed comparable pricing, terms and conditions from those contained in the Lead Ship contract." A.R. Tab 5 at 65.

Consistent with the SSN–22 Acquisition Strategy, the Navy implemented a Source Selection Plan and issued the solicitation, or Request for Proposals (RFP), on November 21, 1990. A.R. Tabs 8, 9. Section M of the RFP set forth the evaluation factors for award of the contract. A.R. Tab 9 at 386–87. Section M states, in pertinent part:

3. The Government may award a contract on the basis of initial offers received without discussions. Therefore, the initial offer should contain the offeror's best terms from a price and technical standpoint.

4. EVALUATION

a. Factors which shall be considered in the Evaluation of offers are, in descending order of importance:

1. Price

2. Industrial Mobilization

The Government reserves the right to select for award on the basis of national defense and industrial mobilization considerations. If industrial mobilization is a factor, it will take precedence over price.

. . . . .

b. Adjustments to the proposed target prices will be made only for the following:

[omitted]

Notwithstanding the above, the Government reserves the right to award on the basis of industrial mobilization base considerations.

Accompanying the RFP was a solicitation letter from the Contracting Officer, Capt. Richard Muth. A.R. Tab 10.[8] As the parties concede, the RFP together with the solicitation letter both constitute the solicitation, and the letter is as important as Section M of the main body of the solicitation. The solicitation letter states in pertinent part:

The Navy's long term goal has been to have two nuclear qualified shipbuilders to provide for competition and an industrial base. For this reason, most of the recent SSN 688 Class submarines were competitively awarded pursuant to the Industrial Mobilization exception, which provides the Navy the authority to allocate ship awards, as considered neces-

---

**8.** The language of the letter was drafted by Admiral Firebaugh; *see* A.R. Tab 5 at 67.

sary, to maintain two nuclear capable construction shipyards.

Similarly, the SSN 21 Program was structured from the outset to promote competition and maintenance of two sources for the life of the program.... In consonance with this established acquisition approach and with Congressional direction, the FY 1991 SSN 21 Class submarine will be competed pursuant to the Industrial Mobilization exception, with award to be made on the basis of price and other factors including Industrial Mobilization. As with past acquisitions of attack submarines, if Industrial Mobilization requirements merit consideration, this factor may be of greater importance than price.

Consideration of Industrial Mobilization must not undermine the integrity of the lead ship competition by resulting in a contract with terms more favorable than the lead ship contract. This is distinguishable from recent SSN 688 competitions which did not involve establishing a second source. Accordingly, the Industrial Mobilization factor will only be considered for establishment of a second source if the second source's offer does not exceed a price that is comparable to that contained in the lead ship contract, and the offer fully conforms to the terms and conditions in the attached solicitation.

We have determined the comparable price, after adjustments, to be $708 million....

/s/ Richard F. Muth
Contracting Officer

Reference was made in the solicitation letter to the previous submarine solicitations. Three previous attack-submarine solicitations were submitted to the Court. The SSN–22 solicitation differed materially from the previous ones. The earlier solicitations listed factors, including price, which

"shall be considered," and then stated that industrial mobilization base is a factor which "may be considered." Court Ex. 4, 9. This solicitation, in contrast, specified that Industrial Mobilization was a factor which "shall be considered." Furthermore, under the evidence presented, no previous solicitation had specified an amount above which the Industrial Mobilization factor would not be considered. See Court Ex. 4, 8, 9. In the prior solicitations, although the language was permissive, awards were made to Electric Boat on the basis of "industrial mobilization" where Electric Boat was not the low bidder.

Here, the Navy ensured that Newport News's bid would be competitive with Electric Boat's bid for the lead ship contract by setting $708 million as a ceiling price above which industrial mobilization would not be considered.[9] However, the parties differ as to the effect of a bid by Newport News below the ceiling price. The Navy argues that because Congress only directed it to consider the "desirability" of a competitive acquisition strategy, it did not have to consider industrial mobilization as a factor. The Navy also argues that the solicitation merely reserved the right to consider industrial mobilization. Newport News contends that the terms of the solicitation required that once it bid below $708 million, it would automatically receive the award.

The Court previously found that Newport News's interpretation was reasonable, but not the only possible interpretation. Order of May 31, 1991, at 22. The solicitation letter stated:

[T]he SSN 21 Program was structured from the outset to promote competition and maintenance of two sources for the life of the program.... In consonance with this established acquisition approach and with Congressional direction, the FY 1991 SSN 21 Class submarine *will be competed pursuant to the In-*

9. The House Armed Services Committee recommended this approach in its report on the 1991 defense authorization bill:

To avoid undercutting the results of the previously conducted competition for the construction of the first Seawolf, the committee believes that the Navy should use the same

terms, conditions, and price included in the lead ship construction contract for the second Seawolf ...

House Armed Services Committee Report on the National Defense Authorization Act for Fiscal Year 1991, H.R.Rep. No. 101–665, 101st Cong., 2d Sess. 70 (1990).

*dustrial Mobilization exception, with award to be made on the basis of price and other factors including Industrial Mobilization.* As with past acquisitions of attack submarines, if Industrial Mobilization requirements merit consideration, this factor may be of greater importance than price.

(Emphasis added.) Section M of the solicitation also provided:

If industrial mobilization is a factor, it will take precedence over price.

The solicitation clearly established that if Newport News bid below $708 million, the award would be made on the basis of industrial mobilization. Because the solicitation letter clearly defined Industrial Mobilization as the maintenance of two shipyards capable of producing the Seawolf submarine, Industrial Mobilization could only mean the establishment of Newport News as a second source for Seawolf submarines. If Industrial Mobilization were applied as a factor taking precedence over price, as the solicitation indicated it would be, then award of the SSN–22 contract to Newport News would be mandated.

The question of the "delta," or the differentiation in price between two bids, becomes extremely important in an award based on Industrial Mobilization. In this case, the delta represents the cost of establishing a second source. Were Electric Boat's bid only $1 below that of Newport News, the rational decision would be to award the contract to Newport News, for the $1 would be far exceeded by the savings obtained in later competitive acquisitions. For example, if competition reduced the price of ten future contracts by $10 million apiece, establishing competition at a cost of less than $100 million might be justified by economics alone, without regard to Industrial Mobilization.[10]

If the Navy awarded contracts solely on price, the award of a lead ship contract would create a monopoly, because of the effect of start-up costs discussed above. It is a fundamental principle of economics that monopolies cause prices to remain high, while competition causes them to fall. The bids for the SSN–22 itself demonstrate the value of competition. Electric Boat bid $615 million, $93 million below the price of the first contract. Were Electric Boat the only bidder, it could bid up to one dollar below $708 million, which the Navy has established as the reasonable cost for obtaining the ship.

It would appear undisputed that the benefits of competition would justify an award to Newport News if the delta were $1, or $1,000, or even $1 million. At some point, of course, the cost of establishing a second source will no longer exceed the savings incurred through competition; that is, the delta will be too large to justify an award based on the economics of competition. The ability to produce many ships for war or national emergency must then be evaluated. Thus, in considering an award based on Industrial Mobilization, one should determine whether the value of competition in the long run is worth the immediate cost of creating competition, and whether this cost is justified by a national emergency or economic considerations.[11]

In prior bids for submarine construction contracts, it would appear that industrial mobilization awards could be justified when the delta was $30 to $60 million. In this case, however, the Navy evidently did not determine what would be an acceptable "delta" at the time it issued the solicitation, nor did it determine what the "value" of Industrial Mobilization might be in dollars. The Navy did not set the value of future competitiveness as an objective standard against which the SSN–22 delta could be assessed. Rather, the Navy determined that if the potential second source bid below a ceiling price of $708 million, then it would be worthwhile over the long term to employ the second source. The solicitation indicated that the delta was determined

---

**10.** In evaluating the future value of competition against the immediate cost of establishing competition, the immediate cost must be adjusted by including compounded interest or loss of use of money.

**11.** *See supra* note 10.

with regard to the original SSN–21 lead ship contract cost, and that if Newport News bid below $708 million, Industrial Mobilization would control the award and Newport News would receive the contract. Newport News could reasonably have believed this interpretation and could reasonably have believed that this was the only interpretation.

The problem in this case arose in December 1990, after the solicitation for bids was issued but before the bids were received or accepted. At that time, the Seawolf construction profile—the planned number of ships in the program and the schedule of their construction—was reduced from three ships every two years to one ship per year. A.R. Tab 37 at ¶¶ 2, 3. This reduction in the anticipated number of ships necessarily reduced the value of competition in future contracts. It reduced the value of industrial mobilization, that is, the value of establishing a second source. However, the definition of Industrial Mobilization in the solicitation remained constant, and the delta remained fixed by the price of $708 million set forth in the solicitation. The Navy ultimately failed to consider Industrial Mobilization at all. The Navy contends that it did consider Industrial Mobilization, and that it rejected it as a factor. However, the meaning of Industrial Mobilization the Navy claims it considered was substantially different from that specified by Congress, by the regulations, and by the solicitation.

As previously stated, Electric Boat bid $615 million, and Newport News bid $688 million, resulting in a delta of $73 million. A.R. Tab 15 at 1038. The Navy determined that an Industrial Mobilization award was justified; that is, the cost of establishing a second source was not prohibitive. *See* A.R. Tab 15 at 1040 ¶¶ 8, 10; A.R. Tab 16 at 1059 ¶ 3.

While undertaking this analysis, the Navy formulated the "two-ship award." The reasoning behind this award lies in the fact that over the last two years the assessment of the Soviet threat has been greatly reduced, while at the same time the budget for the Seawolf program has plummeted. The Navy originally planned to construct 29 Seawolf submarines at a rate of three per year. By the time the solicitation for bids for the SSN–22 was issued, the production schedule had been reduced to three every two years. At some point in December 1990, after the solicitation was issued but before the bids were received, the Navy again reduced its plans, projecting one ship per year until FY 1996, when two would be constructed. A.R. Tab 37 at ¶¶ 2, 3.

By January and February 1991, the Navy had determined that this rate of production was insufficient to support construction of Seawolf submarines at two shipyards. A.R. Tab 15 at 1039 ¶ 7. The Navy concluded that Electric Boat could not remain competitive if it constructed less than one submarine per year; consequently, Electric Boat would not survive as a shipyard if it did not receive the SSN–23 contract and at least one Seawolf contract a year afterwards. A.R. Tab 15 at 1040 ¶ 9, 1047, 1049; A.R. Tab 16 at 1059 ¶ 4. Newport News, to the contrary, would be able to survive in the submarine business if it built one submarine every other year, according to Admiral Firebaugh and Mr. Campbell. The difference, in Admiral Firebaugh's opinion, is that Newport News, unlike Electric Boat, is also engaged in construction and overhaul of nuclear aircraft carriers, and does not depend solely on submarine business to sustain its nuclear shipbuilding capability. A.R. Tab 15 at 1047.

The Navy determined that if Electric Boat received the SSN–22 (FY 91) contract, "EB may freeze NNS out of the SEAWOLF construction program due to competitive advantage and budgetary limitations." A.R. Tab 15 at 1039. The Navy also determined that if Newport News received the SSN–22 contract on a standalone basis and Electric Boat did not receive the SSN–23 (FY 92) contract, Electric Boat would "become non-competitive for future awards." A.R. Tab 15 at 1049. The Navy also concluded that award of the SSN–22 to Newport News would not substantially affect Electric Boat's near term competitive and economic viability, nor would award of the SSN–23 to Electric Boat affect the viability of Newport News

if Newport News received the SSN–22. A.R. Tab 15 at 1050.

During the evaluation of the bids for the SSN–22 contract, the Navy undertook a cost-analysis of various strategies for awarding Seawolf contracts through 1994. *See* A.R. Tab 25. This analysis showed three equally cost-effective alternatives: (1) to award all four submarines to Electric Boat; (2) to award the SSN–22 (FY 91) to Newport News, the SSN–23 (FY 92) to Electric Boat, and the next two ships to Electric Boat; or (3) to award the SSN–22 (FY 91) to Newport News, the SSN–23 (FY 92) to Electric Boat, and the next two ships to Newport News.[12]

The Navy thus formulated the two-ship award, whereby Newport News would receive the SSN–22 contract, and the Navy would negotiate with Electric Boat for a sole-source, advanced acquisition contract for the SSN–23, pursuant to the long-lead time production authorization. Both noncompetitive awards would be justified by Industrial Mobilization. The two-ship award would place the two shipyards in a position of relative parity for the next competition, whether that competition was for a single-ship or multi-ship award. The two-ship award would also keep the two yards in construction for at least two additional years, until the future construction profile of the Seawolf program could be better assessed. *See* A.R. Tabs 15 at 1039–40, 16. The Navy also determined that this strategy was less expensive than awarding the SSN–22 contract on a stand-alone basis and then making a subsequent competitive award of the SSN–23 to either shipyard. A.R. Tab 16 at 1060 ¶ 6.

As already discussed, the two-ship award was rejected by Under Secretary Yockey, and this Court finds that he directed the Navy to award the contract based on price alone. Yockey's rejection of the two-ship award effectively rejected the desirability of a competitive acquisition strategy, which Congress had expressed its desire to main-

tain. When one considers that the Navy determined that award of the SSN–22 to Newport News would not substantially impair Electric Boat in the near term but that award of the SSN–22 to Electric Boat would significantly affect the continuing viability of Newport News, one must be aware of the gravity of the decision of Acting Under Secretary Yockey to put Newport News out of the submarine business.

Notwithstanding the Court's finding that the Navy could not, under Yockey's command, make an industrial mobilization base award to Newport News even had it wished to, the Navy maintains that after the April 16 ADM it again considered Industrial Mobilization, but determined that it was not a factor. The Court finds as a fact, by clear and convincing evidence, that the Navy failed to consider Industrial Mobilization at all in its award of the contract. Although the Navy contends that it considered it and rejected it in the award of the contract, the meaning it claims it considered was substantially different from that specified in the regulations and the solicitation itself.

As defined by the terms of the solicitation and pursuant to Congressional directives, Industrial Mobilization meant the establishment of a second source for the entire Seawolf program. In this sense, Industrial Mobilization was a factor in favor of an award to Newport News, the second source. After December 1990, however, the Navy determined that the reduced Seawolf construction profile was insufficient to support two shipyards over the long term. The Navy also concluded that if one shipyard received the SSN–22 contract on a stand-alone basis, that yard would have a competitive advantage in the next competition. A.R. Tab 25 at 1110–11. Under the two-ship award, Industrial Mobilization took on a more limited meaning of "levelling the playing field," or maintaining two shipyards over the short run so that later, when the future Seawolf construction profile could be more definitely ascer-

---

**12.** The testimony of Admiral Firebaugh, the Seawolf program manager and Source Selection Authority, indicated that there were very minor differences between the projected costs of each of these three alternatives, which might ultimately vary upward or downward. These differences he deemed inconsequential.

tained, the two shipyards could compete from a position of relative parity. *See* A.R. Tabs 15, 16. The decision to narrow production to only one shipyard, if this in fact became necessary, would be delayed for another year or two.

The Navy never informed Electric Boat and Newport News that the meaning of Industrial Mobilization had been changed. In any event, Acting Under Secretary of Defense Yockey rejected the two-ship award, *see* A.R. Tab 28. This either caused Industrial Mobilization, even in its revised sense, to drop out of the equation completely, or changed its meaning yet again, so that Industrial Mobilization now meant maintaining a sole source. Whichever shipyard received the contract would have a competitive advantage for the next competition, however that competition might be structured. Furthermore, there was a possibility that because of this advantage in the next competition, whichever yard received the SSN–22 contract might become the sole source for the entire Seawolf program. The Navy thus claims it could only evaluate the stand-alone award of the SSN–22 contract on the basis of price, requiring an award to Electric Boat. *See* A.R. Tabs 36, 37. The Navy now states that Industrial Mobilization favored neither shipyard, for it was either not a factor or its definition had completely changed from that set forth in the solicitation letter. In either event Newport News was misled.

The solicitation had clearly defined Industrial Mobilization as the establishment of a second source. Whether one says that Industrial Mobilization was not considered at all, or whether one says that it was considered in the sense of "levelling the playing field" for the next competition, the Court finds by clear and convincing evidence that the Navy did not consider Industrial Mobilization as a factor, especially in the sense specified in the solicitation.

■ As stated in the order of May 31, 1991, a solicitation must include a statement of all significant factors which will be considered in evaluating bids, and of the relative importance assigned to each of those factors. 10 U.S.C. § 2305(a)(2)(A).

The selection authority must evaluate bids based solely on the factors specified in the solicitation. *Id.* § 2305(b)(1); 48 C.F.R. § 15.608(a). If the award is based on evaluation factors significantly different from those listed in the solicitation in terms of content and/or relative importance, then an unsuccessful bidder is entitled to relief if it was prejudiced by such actions. *CACI Field Services, Inc. v. United States*, 13 Cl.Ct. 718, 728 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988).

■ The Court has already concluded that the RFP and solicitation letter, taken together as they must be, indicated that the Navy would consider Industrial Mobilization in evaluation of the bids, and that Industrial Mobilization meant the establishment of a second source for the Seawolf program. The Navy did not in fact consider Industrial Mobilization in its award. This violated the terms of the solicitation. Moreover, even assuming the Navy considered Industrial Mobilization as it claims it did, the definition of Industrial Mobilization the Navy claims to have considered varied materially from the definition initially promulgated and specified in the solicitation. This also was illegal.

### 4. Prejudice

■ It is clear that the competitive acquisition strategy formulated and presented to Congress was not followed. Newport News was effectively removed as a competitor without consideration of the competitive acquisition plan. The general statutes mandating the use of the strategy, and the Appropriations Act requiring the Secretary of the Navy to consider all applicable factors including the desirability of a competitive acquisition strategy, were not followed. It is also clear that the award to Electric Boat did not adhere to the factors set forth in the terms of the solicitation.

Newport News was prejudiced in three ways. First, its bid was not considered in accordance with the acquisition strategy in effect and forwarded to Congress. Had its bid been considered in accordance with the acquisition strategy, Newport News could

and probably would have been awarded the contract.

Second, its bid was not considered after Yockey's command of April 16, 1991, because its bid price was higher than Electric Boat. Acting Under Secretary Yockey, contrary to the acquisition plan, and contrary to law and without any rational basis, arbitrarily and capriciously prevented any award to Newport News after April 16, 1991. The Court finds that Newport News would have been reasonably considered for the award but for the illegal action of Acting Under Secretary Yockey, and was thereby prejudiced.

Third, in awarding the contract, the terms of the solicitation were not followed but were ignored. Had the terms of the solicitation been followed reasonably as written, Newport News would have been awarded the contract. This is the ultimate prejudice. The solicitation set forth two factors in descending order of importance, price and Industrial Mobilization. Price was the primary factor in that Industrial Mobilization would only be considered for establishment of a second source if the second source's offer did not exceed $708 million. Once Newport News bid a "price" below $708 million, however, Industrial Mobilization, the desire for a second source, was to take precedence over price.

In addition, the Court finds that had the wording been similar to that of prior submarine contracts, as the Navy claims it intended, then Newport News would have bid lower. Certainly if the wording of the solicitation had not been so strong in favor of Industrial Mobilization, Electric Boat might have bid higher.

### REMEDY

■ This Court sits as a court of equity. In analyzing the position of the parties in this case, one must apply equitable principles. This Court's function is to ensure fair play and substantial justice, not only for Newport News but for the Government and Electric Boat as well.

The Government has illegally awarded a contract to Electric Boat, who benefitted from the illegal action without fault on its part. Newport News has been prejudiced by this illegal action, but acted promptly and expeditiously to endeavor to correct the action prior to the expenditure of any funds by any of the parties. There is no problem in declaring the contract illegal and therefore null and void and of no effect, and this the Court does.

However, it would be improper for the Court to direct award of the contract for the SSN–22 to Newport News. All parties cite *Delta Data Systems Corp. v. Webster*, 744 F.2d 197 (D.C.Cir.1984), as the leading case on the question of the proper remedy in a bid protest case such as this. In that case the Court of Appeals for the District of Columbia Circuit wrote:

> ... we must have prominently in mind "the discretion that is typically afforded officials in the procurement agencies by statutes and regulations." Judges are "ill-equipped to settled the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors, and the need for expeditious buying decisions require assessments 'better left to the expertise of an executive agency....' "

744 F.2d at 203 (citations omitted). The Court also wrote: "It is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties." *Id.* at 204 (*quoting Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C.Cir.1970)). The Court concluded that

> a court may not order the award of a contract unless it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award.

744 F.2d at 204; *see also Choctaw Mfg. Co., Inc. v. United States*, 761 F.2d 609, 619 (11th Cir.1985).

This Court cannot find that but for the Navy's illegal actions Newport News would have received the contract. Although Congress directed the Navy to consider industrial base as a factor, as well as

cost, in determining the award of the contract, Congress did not mandate that industrial mobilization take precedence over price. This was the error of the Navy in drafting the solicitation. Obviously the delta must be assessed against the value of future competition, bearing in mind the future ability to deliver submarines and weighing all the factors essential to the defense of our country in a national emergency.

In this case, the planned number of Seawolf submarines was reduced after the solicitation was issued. This may have changed the value of future competition and the necessity for particular times of delivery, and thus changed the Navy's position that once the second source bid below $708 million, an industrial mobilization award was justified. The Navy never considered the solicitation in this light, however. Pursuant to the command of Acting Under Secretary Yockey, the Navy awarded the contract on the basis of price alone. Although this was illegal, the Navy could have cancelled the solicitation instead of awarding the contract to Newport News. Because of this fact, the Court cannot say that Newport News would have received the SSN–22 contract but for the illegal actions of the Government. *Delta Data Systems Corp. v. Webster*, 744 F.2d at 205–06.

In a properly worded solicitation with a definitive competitive acquisition strategy in place, the Navy could award a contract to a higher bidder pursuant to that strategy if it determined, not arbitrarily or irrationally, that a particular delta would be economically justified, bearing in mind production in time of national emergency. The criteria must be established and in place prior to any award, and the solicitation must be sufficiently clear and definitive so as not to mislead the bidders. However, the strategy may not be adopted after the award of the contract, but must be adopted prior thereto, and the strategy must be rationally considered in determining the award, not in rationalizing an award already made. This case exempli-

fies an attempted rationalization of an illegally awarded contract pursuant to a command made arbitrarily and capriciously without rational basis. The legal commands of the legislative branch were overridden and disregarded by the executive.

The Court declares that the award of the contract to construct the SSN–22 to Electric Boat violated the statutes and regulations of the United States and the terms of the solicitation, and is void and of no effect. The defendants are hereby ordered to conduct a resolicitation of bids, with the terms and conditions of the resolicitation such as to place the parties in the same relative position that they occupied when the Navy received the bids on January 8, 1991. The parties are further directed to proffer to the Court a proposed resolicitation in compliance with the terms of this order for approval of this Court within fourteen days of the date hereof. The Navy is directed to consider any award of the contract in accordance with law. The defendants are enjoined from proceeding with the contract illegally awarded May 3, 1991, which is the subject of this suit.

IT IS SO ORDERED.