960 F.2d 386
 60 USLW 2620, 37 Cont.Cas.Fed. (CCH) P 76,285
 NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Plaintiff-Appellee,
v.
GENERAL DYNAMICS CORPORATION, Electric Boat Division,
Defendant-Appellant,
and
United States Department of the Navy; H. Lawrence Garrett,
III, Secretary, Department of the Navy, Defendants.
State of Connecticut; Commonwealth of Virginia, Amici Curiae.
NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF the NAVY; General Dynamics
Corporation, Electric Boat Division; H. Lawrence
Garrett, III, Secretary, Department of
the Navy, Defendants-Appellees.
State of Connecticut; Commonwealth of Virginia, Amici Curiae.
 Nos. 91-2211, 91-2212.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 4, 1991.
Decided March 16, 1992.
 
 John Crawford Hoyle, Civ. Div., U.S. Dept. of Justice, Thomas C. Papson, McKenna & Cuneo, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., Anthony J. Steinmeyer, Thomas M. Bondy, Malcolm L. Stewart, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Kenneth E. Melson, U.S. Atty., Norfolk, Va., Craig S. King, Gen. Counsel of the Navy, George P. Williams, Office of Gen. Counsel of the Navy, Robinwyn D. Lewis, Robert E. Lieblich, James Recasner, Associate Counsel, Naval Sea Systems Command, C. Stanley Dees, J. Keith Burt, McKenna & Cuneo, Washington, D.C., Merle J. Smith, Jr., Div. Counsel, Gen. Dynamics Elec. Boat Div., Groton, Conn., Conrad M. Shumadine, Willcox & Savage, P.C., Norfolk, Va., on brief), for defendant-appellant.
 Gregory Neil Stillman, Hunton & Williams, Norfolk, Va., argued (D. Arthur Kelsey, Hunton & Williams, Norfolk, Va., Donald C. Holmes, Michael A. Gordon, Holmes, Schwartz & Gordon, Rockville, Md., on brief), for plaintiff-appellee.
 Richard Blumenthal, Atty. Gen., William B. Gundling, Associate Atty. Gen., Henry S. Cohn, Asst. Atty. Gen., Office of Atty. Gen., Hartford, Conn., for amicus curiae State of Conn.
 Mary Sue Terry, Atty. Gen. of Va., R. Claire Guthrie, Stephen D. Rosenthal, Deputy Attys. Gen., Roger L. Chaffe, Sr. Asst. Atty. Gen., John B. Sternlicht, Asst. Atty. Gen., Office of Atty. Gen., Richmond, Va., for amicus curiae Com. of Va.
 Before HALL, NIEMEYER, and LUTTIG, Circuit Judges.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Two shipyards in the United States have the capability of building the Seawolf nuclear submarine for the U.S. Navy, one operated by the Electric Boat Division of General Dynamics Corporation in Groton, Connecticut, and the other by Newport News Shipbuilding and Dry Dock Company in Newport News, Virginia. This appeal involves the dispute between these shipyards over the award of the next Seawolf contract.
 
 
 2
 The Seawolf is the Navy's most advanced submarine, replacing both the Los Angeles class attack submarine and the Trident ballistic missile submarine. Because recent budgetary cutbacks in the Seawolf program permit the construction of only one ship per year, the award to one shipyard of the next Seawolf, the SSN-22, will inevitably threaten the viability of the other. The loss of jobs that will result from losing the bid will have a significant impact not only on the losing bidder, but also on the community in which the shipyard is located.[1]
 
 
 3
 It is basic that awarding Navy contracts for the construction of nuclear submarines must remain the responsibility of the executive branch in conformity with legislative funding authorizations and that the judiciary must scrupulously refrain from injudicious intermeddling. The judiciary is given the responsibility of determining only whether the Navy complied with the law in awarding the contract and whether its conduct in doing so was rational. We have reviewed the congressional authorization for the Seawolf and the Navy's conduct in soliciting and awarding the contract to Electric Boat, and we are satisfied that the Navy complied with applicable statutes and that its decision-making process was directed by relevant and rational factors. We therefore defer to the Navy's decision in awarding the contract to Electric Boat and reverse the decision of the district court, 771 F.Supp. 739 (E.D.Va.1991).
 
 
 4
 * For the past twenty years, Newport News and Electric Boat have constructed nuclear-powered ships, including submarines, for the Navy, and they are the only two shipyards that have that capability. The complexity of the task, the initial expense, and the long lead time to develop a skilled work force virtually assured that no other would emerge. For the same reasons, once one shipyard is closed, the likelihood of its competing again for nuclear-powered ship construction in the absence of an emergency is almost nil.
 
 
 5
 In 1982 the Navy began development of the Seawolf class nuclear attack submarine. The Seawolf is designed to achieve unprecedented levels of technical performance and war-fighting capability. Armed with an advanced combat system, it will be extremely quiet, fast, and "survivable." The Seawolf is the only type of nuclear submarine that the Navy currently plans to build, and both the Los Angeles class attack submarine and the Trident ballistic missile submarine programs will be phased out upon completion in the mid-1990's of those presently under construction.
 
 
 6
 In its original plan, the Navy intended to construct 15 Seawolf class submarines through Fiscal Year ("FY") 1995: the lead ship in FY 89, two ships each in FY 91 and FY 92, three ships each in FY 93 and FY 94, and four ships in FY 95. According to Rear Admiral Millard S. Firebaugh, the Seawolf program manager, the Navy planned to continue this course into the future, to "sustain a force structure" of 100 attack submarines. The Navy's plan included an acquisition strategy which stressed the importance of maintaining the submarine construction capability of both Electric Boat and Newport News, and emphasized the merit of fostering competition between them. The strategy recognized that the continued participation of both shipbuilders in the Navy's nuclear submarine program was essential to maintain critical skills and capabilities to meet any "surge requirements" in the event of national emergency. The preservation of an industrial base that assures two sources of supply which can be mobilized to meet emergency needs is known as the "industrial mobilization" factor.
 
 
 7
 Following the collapse of the Berlin Wall, the end of the Cold War, and subsequent defense budgetary reductions, the number of Seawolf submarines authorized was accordingly decreased. The Navy's subsequent attempt to accommodate reductions and still maintain the viability of two shipyards to provide the base for industrial mobilization produced the tension that is at the heart of this litigation.
 
 
 8
 For the prototype submarine in the Seawolf program, the SSN-21, the Navy solicited competitive bids, and in 1989 made the award to Electric Boat on its low bid of $726 million. The Navy recognized that the award would give Electric Boat a significant advantage over Newport News in future competitive Seawolf procurements due to the enormous start-up costs associated with Seawolf construction. Therefore, in order to preserve the industrial base of two shipyards for future mobilization, the Navy authorized a sole-source award for the second ship, the SSN-22, to Newport News on a negotiated basis. The Navy and Newport News, however, were unable to arrive at an acceptable price before the negotiations were preempted by the enactment of the Department of Defense Appropriations Act of 1991, Pub.L. No. 101-511, 104 Stat. 1856 (1990), which mandated competition in the SSN-22 award. The Appropriations Act explicitly required that awards be the product of competition between the shipyards. At the same time the act mandated that the Navy "consider all applicable factors" and the legislative reports make clear an intent to encourage continued attempts to satisfy the policy of preserving the industrial base.
 
 
 9
 During the period when the Appropriations Act was being considered, in August 1990, the Secretary of Defense completed his Major Warship Review. This review, which was part of a broad-based analysis of future defense requirements, resulted in the reduction of the Seawolf program to one ship in FY 91, two ships in FY 92, and so on at the rate of three ships every two years. According to Assistant Secretary of the Navy Gerald Cann, this change "reduced the procurement quantities to what appeared to be the minimum necessary to effectuate the original competitive acquisition strategy and maintain both shipyards in [Seawolf] construction through the life of the program."
 
 
 10
 On November 9, 1990, Rear Admiral Firebaugh proposed a specific acquisition strategy for the second Seawolf submarine, the SSN22, which was approved by the Department of Defense. In his recommendation memorandum, he identified three alternative approaches to the procurement: (1) provide a sole-source award to Newport News in order to establish a second source; (2) conduct a "[s]traight competition between the yards[;]" or (3) allow for "[c]ompetitive acquisition with the Navy reserving the right to allocate, if necessary, to maintain the mobilization base." Because the 1991 Appropriations Act required the Navy to "compete" the award, he rejected the first approach of negotiating solely with Newport News. He also determined that the second approach, a straight competition, "could easily pass up an opportunity to introduce a second source to promote long-term competition." Therefore, he recommended the third alternative, and decided "that a competitive procurement which provide[d] the Navy with the flexibility to make a mobilization base award [was] the only reasonable approach given the language of the [1991] Department of Defense Appropriations Act." His recommendation was coupled with the caveat that allocation to a second source would occur only if the second source proposed a price equal to or less than the adjusted price of the lead ship contract. The recommendation of Rear Admiral Firebaugh was approved as the acquisition strategy for the SSN-22 by the Defense Acquisition Board, an advisory board concerned with major defense acquisitions and chaired by the Deputy Under Secretary of Defense for Acquisition, Donald Yockey.[2]
 
 
 11
 On November 21, 1990, the Navy issued the solicitation for the SSN-22, consisting of a Request for Proposals and a solicitation letter, and sent it to Electric Boat and Newport News. Before bids were received, however, in December 1990, the number of Seawolfs scheduled for construction was again reduced from three ships every two years to one ship per year, with the exception of FY 96 in which two ships were planned. At this point, according to Assistant Secretary Cann, it became readily apparent that the procurement rate of one ship per year would not maintain both Electric Boat and Newport News in Seawolf construction.
 
 
 12
 On January 8, 1991, Electric Boat and Newport News submitted their bids for the SSN-22 in response to the solicitation sent the previous November. Electric Boat's bid of $615 million, adjusted for escalation, government property rental, and other conditions, turned out to be approximately $90 million lower than Newport News' bid of $688 million when adjusted on the same basis. The bid of Newport News, nevertheless, was within the limit determined by the Navy to be the adjusted price of the lead ship.
 
 
 13
 The bids were evaluated by the Source Selection Advisory Council, and on January 30, 1991, the Council submitted a report to Rear Admiral Firebaugh which recommended that an award be made to Newport News on the basis of industrial mobilization. At the same time, the council determined that Electric Boat also needed to build at least one submarine per year to remain in business, and recommended that the Navy award to Electric Boat an advanced acquisition contract for the SSN-23 (FY 92), for which funds had not yet been appropriated. This overall recommendation became known as the "two-ship plan." Because the two-ship plan did not conform to the approved acquisition plan, which authorized the award of one SSN-22 pursuant to a competitive acquisition strategy, Under Secretary Yockey insisted that the inconsistent two-ship plan be put before the Defense Acquisition Board.
 
 
 14
 On April 15, 1991, when the Defense Acquisition Board convened to review the Navy's proposal, it considered a Defense Department assessment which concluded that the reduced size of the Seawolf program would not be sufficient to sustain both shipyards and therefore that the Navy's proposal of allocating contracts between both yards did not present the lowest cost alternative through the five year defense plan. The assessment also determined that the Navy's two-ship plan was not consistent with competitive source selection. The plan was rejected and the Navy was instructed to proceed with the SSN-22 award on the basis of overall cost and technical approach and to hold a separate competition for the SSN-23. Because the Navy had not briefed the merits of an industrial mobilization award for the SSN-22 standing alone, it was also advised that if it wished to award the SSN-22 contract on this basis, it would need to present its plan to the Board for approval.
 
 
 15
 In light of the decision of the Defense Acquisition Board, Rear Admiral Firebaugh and his Source Selection Advisory Council reevaluated the offers for the SSN-22 and reconsidered the industrial mobilization factor in the context of a one-ship award. Rear Admiral Firebaugh's industrial mobilization analysis included consideration of five factors:
 
 
 16
 (1) a cost analysis which established that the construction rate of one ship per year was inadequate to sustain efficient production at both yards; (2) a competition analysis which indicated that the winner of the SSN-22 contract would have a decided advantage in future competitions, and that effective competition could not be maintained at the rate of one ship per year; (3) the Navy's interest in having both yards participate in construction to promote efficient execution of their respective design responsibilities; (4) the fact that Newport News'[ ] bid was below the $708 million ceiling, and it was therefore possible to consider Newport News for a second source award based upon industrial mobilization; and (5) the Navy's interest in maintaining two nuclearcapable private yards.
 
 
 17
 Rear Admiral Firebaugh thereafter advised Assistant Secretary of the Navy Cann that industrial mobilization had been fully considered, and that, on the basis of his review, industrial mobilization was not a factor with respect to the SSN-22 award. Rear Admiral Firebaugh accordingly determined that the award should proceed based upon the evaluated price factor set forth in the solicitation. This recommendation was reviewed by the Assistant Secretary of the Navy, and on May 2, 1991, Rear Admiral Firebaugh was authorized to proceed with the award of the SSN-22 construction contract in accordance with his determination.
 
 
 18
 On May 3, 1991, the Navy awarded the contract for the SSN-22 to Electric Boat on the basis of price, and three days later, Newport News filed suit against the Navy in the district court challenging the award. On May 7, 1991, the district court entered a temporary restraining order against the Navy's proceeding with the contract and ordered that Electric Boat be joined as a defendant. After hearings the district court entered a preliminary injunction prohibiting Electric Boat and the Navy from taking further steps to perform the contract for the SSN-22 Seawolf submarine. On July 31, 1991, the court determined that "the award [by the Navy] of the contract to construct the SSN-22 to Electric Boat violated the statutes and regulations of the United States and the terms of the solicitation." 771 F.Supp. at 741. It made its earlier injunction permanent and ordered the Navy to resolicit bids and make a new award, subject to court approval. Id.
 
 
 19
 The district court's opinion reached the conclusion that in awarding the SSN-22 submarine to Electric Boat, the Navy failed to take into account industrial mobilization, thereby violating the congressional mandate and the Navy's own acquisition plan. The district court found that when Under Secretary Yockey disapproved the Navy's two-ship purchase strategy of awarding the SSN-22 to Newport News and the SSN-23 to Electric Boat, he effectively mandated that industrial mobilization be ignored and that the SSN-22 contract be awarded to Electric Boat on the basis of price. As the court stated, "[F]or no explicable reason and wholly without rational basis, Yockey arbitrarily and capriciously ordered the SSN-22 to be awarded to Electric Boat on the basis of price alone." Id. at 747. From that finding the court reasoned that industrial mobilization was not considered and the 1991 Appropriations Act and the acquisition plan adopted pursuant to the act were violated. The court concluded moreover that Yockey "lacked authority under the Defense Department directives to prevent the Navy from awarding the contract to Newport News on the basis of industrial mobilization." Id.
 
 
 20
 In addition to finding that the Navy violated applicable law, the court also found that the Navy acted arbitrarily by failing to abide by the terms and conditions of its solicitation when it rejected Newport News' bid. As the court concluded, the Request for Proposals taken together with the letter circulating it "clearly established that if Newport News bid below $708 million, the award would be made on the basis of industrial mobilization." Id. at 751. While the court could not conclude that "but for the Navy's illegal actions Newport News would have received the contract," it nevertheless ordered a resolicitation of bids "such as to place the parties in the same relative position that they occupied when the Navy received the bids on January 8, 1991." Id. at 755-56. The court also directed that the parties submit proposed resolicitations to the court for approval. Id. at 756.
 
 
 21
 On appeal, the Navy and Electric Boat challenge the two distinct grounds of the district court's decision and contend that (1) the Navy considered industrial mobilization and adhered to the acquisition strategy in making its award, and (2) the award was consistent with the terms of the solicitation. Newport News cross-appeals, arguing that the Appropriations Act, the acquisition strategy, and the solicitation required the Navy to award the SSN-22 construction contract to Newport News on the basis of industrial mobilization.
 
 II
 
 22
 Before we review the questions presented, we observe generally that military procurement is properly delegated by Congress to the Department of Defense and military authorities, and it is well-established that a disappointed bidder bears the heavy burden of establishing in court that " 'the decision by the government agency either had no rational basis or involved a clear and prejudicial violation of applicable statutes or regulations.' " Ulstein Maritime, Ltd. v. United States, 833 F.2d 1052, 1054 (1st Cir.1987) (quoting Smith & Wesson v. United States, 782 F.2d 1074, 1078 (1st Cir.1986)). As the court in M. Steinthal & Co. v. Seamans observed:
 
 
 23
 In the field of government procurement the courts must be sedulous to heed the admonition that their authority to vacate and to enjoin action that is illegal must be exercised with restraint less the courts fall into the error of supposing that they may revise "action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available."
 
 
 24
 455 F.2d 1289, 1298-99 (D.C.Cir.1971) (quoting Calcutta East Coast of India and East Pakistan/USA Conference v. Fed. Maritime Comm'n, 399 F.2d 994, 997 (D.C.Cir.1968)). Thus the disappointed bidder must demonstrate prejudice attributable to either (1) the procurement procedure's violation of applicable statutes or regulations, or (2) an arbitrary or irrational decision of the procurement official on matters primarily committed to his discretion. See Choctaw Mfg. Co. v. United States, 761 F.2d 609, 616 (11th Cir.1985); Kentron Hawaii Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C.Cir.1973). See also Administrative Procedure Act, 5 U.S.C. § 706 (1988) (stating that reviewing court shall "hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").
 
 
 25
 The judiciary is given no role beyond determining whether these principles of law have been violated, and it should avoid unnecessary intrusion, particularly into matters involving military procurement and preparedness. As the Supreme Court stated in Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953), "Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."
 
 
 26
 These legal prescriptions about the limited role of the judiciary are particularly applicable in this case where we are advised about the significant effect that the Navy's decision will have on the companies and communities involved. We therefore reject the notion argued to some extent by the amici curiae and noted briefly by the district court that the Navy's action in this case warrants stricter scrutiny because "one must be aware of the gravity of the decision of Acting Under Secretary Yockey to put Newport News out of the submarine business." 771 F.Supp. at 753.
 
 III
 
 27
 We address first the contention of the Navy and Electric Boat that the district court erred in concluding that the Navy's decision to award the SSN-22 to Electric Boat violated applicable statutes by failing to consider industrial mobilization and to adhere to an acquisition strategy mandated by 10 U.S.C. § 2438.
 
 
 28
 The Defense Appropriations Act of 1991 imposes three requirements on the government in awarding the SSN-22 Seawolf contract. The Navy must (1) consider "all available options" in adopting an acquisition strategy, (2) "compete the award" for the SSN-22 submarine, and (3) consider all applicable factors in making the award "including the desirability of a competitive acquisition strategy for the entire [Seawolf] program."[3] Additionally, Congress has mandated that in connection with any major defense procurement, an acquisition strategy be adopted and followed. See 10 U.S.C. § 2438 ("Before fullscale development under a major program begins, the Secretary of Defense shall prepare an acquisition strategy" which provides the Secretary with "the option to use competitive alternative sources.").
 
 
 29
 The district court found implicit in these statutory requirements to consider "competition" a mandate also to consider the establishment of a second shipyard for industrial mobilization purposes. See 771 F.Supp. at 744. See also H.R.Rep. No. 665, 101st Cong., 2d Sess. 70 (1990). While the district court determined that the Navy's original acquisition strategy complied with this statutory mandate, it found that Under Secretary Yockey's actions forced the Navy to award the contract to Electric Boat on the basis of price alone, and thereby violated the acquisition strategy and the Appropriations Act.
 
 
 30
 We do not agree that the requirement that the Navy consider "the desirability of a competitive acquisition strategy for the entire [Seawolf] program," see 104 Stat. 1865, mandated the award of the contract to construct the second Seawolf submarine to Newport News, because nothing in this language required the Navy to award the SSN22 contract in a way that would ensure the future existence of competing shipyards. At most, the terms of the act required the Navy to "consider" in making this award, the award's effect on the competitiveness of future Seawolf contracts. See also 10 U.S.C. § 2438. And the legislative history of the Appropriations Act does not serve to contradict this conclusion. See H.R.Conf.Report No. 938, 101st Cong., 2d Sess. 83 (1990) (stating that the Navy should "consider the submarine industrial base and cost factors in determining the winner of the submarine competition") (emphasis added).
 
 
 31
 Throughout the process of awarding the SSN-22 contract the Navy considered the importance of maintaining more than one shipyard under its industrial mobilization policy. The Navy's FY 91 two-ship proposal was largely based on the desire to maintain two shipyards capable of building nuclear submarines. Under Secretary Yockey disapproved the proposal on two grounds. First, Congress had not authorized funds to build the third submarine, the SSN-23, which was one of the two ships included in this proposal. Second, the two-ship proposal amounted to two sole-source awards, conflicting with congressional direction to "compete" the award of SSN-22. See 104 Stat. at 1865 ("[T]he Secretary of the Navy shall compete the award for the next [Seawolf] submarine."). Moreover, the Under Secretary did not foreclose an alternative proposal based on an industrial mobilization policy. He simply required that the Navy obtain further approval in such a case. See 10 U.S.C. § 133(b)(4) (authorizing the secretary of defense for acquisition to "direct the Secretaries of the military departments and the heads of all other elements of the Department of Defense" regarding acquisition matters).
 
 
 32
 After Under Secretary Yockey's decision rejecting the two-ship proposal, the Navy evaluated the bids for the SSN-22 submitted by Newport News and Electric Boat in light of the approved acquisition plan which permits "competitive acquisition with the Navy reserving the right to allocate, if necessary, to maintain the mobilization base." The Navy considered a cost analysis which established that the construction rate of one ship per year was inadequate to sustain production at both shipyards, and concluded, therefore, that effective competition could not be maintained. Having determined that the expanded industrial base could not become a factor at the reduced procurement level of one ship a year, the Navy awarded the contract to Electric Boat on the competitive basis of price.
 
 
 33
 In light of this, we conclude that the Navy not only considered industrial mobilization throughout its procurement decision-making process, but rejected it reluctantly and rationally. Industrial mobilization was a policy favored both by Congress and the Navy in its procurement efforts and its implementation is a matter committed, by statute, to the discretion of the Navy and the Department of Defense. Various approaches for giving effect to the policy of preserving the industrial base were considered. Thus, even assuming that such considerations were required under the circumstances presented here in order to comply with the congressional mandate that "the desirability of a [long-term] competitive acquisition strategy" be considered, the Navy decision complied with the congressional directive. The judgments of the Navy and the Department of Defense about whether the policy could be implemented in the face of shrinking appropriations were not, in our judgment, arbitrary or capricious but rational in response to difficult budgetary circumstances. We therefore conclude that the Navy's decision to award the SSN-22 to Electric Boat was lawful.
 
 IV
 
 34
 The Navy and Electric Boat also contend that the district court erred in concluding that the Navy violated the terms of its solicitation by making an award based only on price. They argue that the court misread the documents when it concluded that "[t]he solicitation clearly established that if Newport News bid below $708 million, the award would be made on the basis of industrial mobilization." 771 F.Supp. at 751. They point out that if the district court's interpretation were the correct reading of the solicitation, Newport News would be impermissibly guaranteed the contract by bidding one dollar under the $708 million figure.
 
 
 35
 Nothing that we can find in the solicitation states that industrial mobilization would in every event be a factor in the award or guaranteed that Newport News would receive the contract if it submitted a bid below the $708 million ceiling. Section M of the Request for Proposals identifies price and industrial mobilization as "[f]actors which shall be considered in the [e]valuation of offers," and further explains that "[i]f industrial mobilization is a factor, it will take precedence over price" (emphasis added).[4] Similar language appears in the accompanying solicitation letter which states that the award for the SSN-22 will "be on the basis of price and other factors including Industrial Mobilization." The letter goes on to state that "if Industrial Mobilization requirements merit consideration, this factor may be of greater importance than price," but that an industrial mobilization award would "only be considered for establishment of a second source if the second source's offer does not exceed a price that is comparable to that contained in the lead ship contract" which was determined to be, after adjustments, $708 million (emphasis added).[5]
 
 
 36
 Read as a whole, the solicitation and the accompanying letter communicate the message that (1) industrial mobilization may be a factor in considering the bids; (2) if industrial mobilization is a consideration it will take precedence over price; and (3) industrial mobilization will be considered, if at all, only if the price is under $708 million. The language of these documents does not permit the interpretation that if the $708 million figure were quoted, industrial mobilization would automatically be applied as the controlling factor and the award would of necessity be made to Newport News. While the submission of a bid under $708 million was a necessary condition for consideration of industrial mobilization, the submission of a bid under $708 million did not divest the Navy and the Department of Defense of the discretion reserved by them to determine whether industrial mobilization would be a factor.
 
 
 37
 This interpretation is confirmed by other language in the solicitation and by surrounding documents from the files of all parties. The solicitation states, "[T]he Government reserves the right to select for award on the basis of national defense and industrial mobilization considerations. If industrial mobilization is a factor, it will take precedence over price" (emphasis added). The Navy's source selection plan provides that "[t]he government reserves the right to select for award on the basis of national defense and industrial mobilization considerations" (emphasis added). Similarly, Newport News' chief estimator, explaining the solicitation documents to his president in a briefing book, stated that the "Industrial Mobilization factor will only be considered if the second source's (NNS) offer does not exceed the $708 million" (emphasis added). The parties' understanding of the solicitation documents confirmed that the $708-million bid was the entry price to a competition in which the industrial mobilization factor would be considered but not assured.
 
 
 38
 Newport News contends alternatively that if its interpretation of the solicitation documents is not the correct one, then the solicitation is ambiguous and therefore void under the Armed Services Procurement Act which requires that the Navy identify "all significant factors" and "the relevant importance assigned to each" of these factors in its solicitation. 10 U.S.C. § 2305(a)(2)(A); see also 48 C.F.R. pt. 15.605e.
 
 
 39
 The contention has little merit. Section M of the Request for Proposals identifies, in descending order of importance, price and industrial mobilization as factors which would be considered in the award. Moreover, it states that if industrial mobilization is determined to be a factor in the award, it would take precedence over price. The other terms of the solicitation and the accompanying letter reaffirm and explain these factors.[6]V
 
 
 40
 The extensive and repeated reductions in defense appropriations, including the reduction in the Seawolf program, have inevitably caused an unfortunate adverse economic impact to the companies and communities involved. They also have adversely affected the military's desired policy of maintaining a broad industrial base which is ready to be mobilized in an emergency. Nevertheless, it is totally rational to conclude, as the Navy and Department of Defense did here, that these continued reductions undermine the possibility of maintaining two shipyards as part of an industrial mobilization policy. The record demonstrates that this inevitable conclusion was reached after considered and rational debate.
 
 
 41
 Even if the law, in requiring that an award be "competed," dictates that industrial mobilization along with other factors be considered, we must defer to the authorized decision of the Navy because we determine that both the Navy and the Department of Defense considered the relevant factors, including industrial mobilization, before awarding the SSN-22 contract, and that their deliberations were directed rationally when concluding that present circumstances did not warrant an industrial mobilization award. Accordingly we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.
 
 
 42
 REVERSED AND REMANDED.
 
 
 
 [1]
 The State of Connecticut, in an amicus curiae brief, contends that loss of the Seawolf contract to Electric Boat will have a "devastating effect ... on Connecticut, its residents and its future.... [It] would cripple the economy of the Groton-New London area in Southeastern Connecticut" where "over 33,000 jobs ... hinge on the Seawolf program." Likewise in an amicus curiae brief, the Commonwealth of Virginia contends that Newport News Shipbuilding is the largest private employer in the state and that loss of the Seawolf contract "will almost certainly put Newport News out of the submarine construction business permanently" and will cause "a total estimated loss of 31,250 jobs.... This single event would raise unemployment by 18% in the Commonwealth as a whole, a truly catastrophic result for the economy of the Tidewater Region and the Commonwealth."
 
 
 [2]
 The Deputy Under Secretary of Defense for Acquisition is required to "act for, and exercise the powers of, the Under Secretary when the Under Secretary is absent or disabled." 10 U.S.C. § 133a(b) (1988). To this effect, Donald Yockey acted as the Under Secretary from January 1, 1991, through the period relevant to this opinion
 
 
 [3]
 The act funded the SSN-22 subject to the following conditions:
 Provided, That the Secretary of Defense shall ensure that the Secretary of the Navy considers all available options under applicable statutes and regulations in the development and promulgation of the acquisition strategy for the [Seawolf]: Provided further, That the Secretary of the Navy shall compete the award for the next [Seawolf] submarine Provided further, That the Secretary of the Navy shall consider all applicable factors in making an award including the desirability of a competitive acquisition strategy for the entire [Seawolf] program.
 Pub.L. No. 101-511, 104 Stat. 1857, 1865 (1990).
 
 
 [4]
 More completely, Section M of the Request for Proposals sets forth the evaluative factors governing the contractual award:
 
 
 [3]
 The Government may award a contract on the basis of initial offers received without discussions. Therefore, the initial offer should contain the offeror's best terms from a price and technical standpoint
 
 
 [4]
 EVALUATION
 a. Factors which shall be considered in the Evaluation of offers are, in descending order of importance:
 
 
 [1]
 Price
 
 
 [2]
 Industrial Mobilization
 The Government reserves the right to select for award on the basis of national defense and industrial mobilization considerations. If industrial mobilization is a factor, it will take precedence over price.
 Notwithstanding the above, the government reserves the right to award on the basis of industrial mobilization base considerations.
 (emphasis added).
 
 
 [5]
 The language of the solicitation letter explained, in pertinent part:
 [T]he [Seawolf] Program was structured from the outset to promote competition and maintenance of two sources for the life of the program.... In consonance with this established acquisition approach and with Congressional direction, the FY 1991 [Seawolf] Class submarine will be competed pursuant to the Industrial Mobilization exception, with award to be made on the basis of price and other factors including Industrial Mobilization. As with past acquisitions of attack submarines, if Industrial Mobilization requirements merit consideration, this factor may be of greater importance than price.
 Consideration of Industrial Mobilization must not undermine the integrity of the lead ship competition by resulting in a contract with terms more favorable than the lead ship contract. This is distinguishable from recent SSN 688 competitions which did not involve establishing a second source. Accordingly, the Industrial Mobilization factor will only be considered for establishment of a second source if the second source's offer does not exceed a price that is comparable to that contained in the lead ship contract, and the offer fully conforms to the terms and conditions in the attached solicitation.
 We have determined the comparable price, after adjustments, to be $708 million.
 (emphasis added).
 
 
 [6]
 While we do not agree with Newport News that the solicitation documents failed to identify the significant factors and their relevant importance, we note that where omissions or inconsistencies in the contract's provisions are patent, the bidder is required to make inquiry regarding them before submitting its bid. See B.D. Click Co. v. United States, 614 F.2d 748, 753 (Cl.Ct.1980). Otherwise, the patent ambiguities will be construed against the bidder. See Big Chief Drilling Co. v. United States, 15 Cl.Ct. 295, 301 (1988)