ALLIANT TECHSYSTEMS,
INC., Plaintiff,

v.

UNITED STATES DEPARTMENT OF the NAVY, The Honorable John H. Dalton, Secretary, Department of the Navy, Defendants,

and

Westinghouse Electric Corporation, Intervenor–Defendant.

Civ. No. 93–1214–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 19, 1993.

 

James A. Dobkin, Rosemary Maxwell, Walter F. Zenner, Arnold and Porter, Washington, DC, for plaintiff.

Helen F. Fahey, U.S. Atty., Richard Parker, Asst. U.S. Atty., Alexandria, VA, Anne Brennan, Dept. of the Navy, Naval Sea Systems Command, Arlington, VA, for U.S. Navy.

Rand L. Allen, Philip J. Davis, James J. Gildea, Wiley, Rein & Fielding, Washington, DC, for Westinghouse.

*MEMORANDUM OPINION*

ELLIS, District Judge.

### I.

In this disappointed bidder case, Alliant Techsystems, Inc. ("Alliant") challenges the Navy's award of a torpedo production contract to a competitor. More specifically, Alliant contends that the award violated both the Competition in Contracting Act, 10 U.S.C. §§ 2301 *et seq.*, and the Federal Acquisition Regulation (FAR), 48 C.F.R. Ch. 1, because it was awarded without the fair and impartial evaluation process that is the cornerstone of full and open competition.

Alliant originally sought a temporary restraining order pursuant to Rule 65(a), Fed. R.Civ.P. Although this request was denied, the Court, pursuant to Fed.R.Civ.P. 65(a)(2), ordered the trial of the action on the merits to be advanced and consolidated with the motion for preliminary injunction. On the basis of the record as a whole, the Court concludes, for the reasons that follow, that plaintiff is not entitled to the relief requested.

### II.

At issue here is the award of the fifth contract in a series of contracts involving the MK50 torpedo. The MK50 torpedo is an advanced, light-weight anti-submarine torpedo designed for use from fixed wing, helicopter, and surface ship platforms. In 1983, Alliant was awarded the "full-scale development" ("FSD") contract to design, develop, and build the MK50 torpedo. As with most FSD contracts, Alliant was required to design and produce certain special tooling and test equipment needed to test and manufacture the torpedo and its components. This equipment category, collectively denominated as Government Production and Research Property ("GPRP"), included circuit test fixtures, feedwater test stand equipment, sonar alternator test equipment, potting molds, holding fixtures, alignment fixtures, overtemp controllers, and afterbody simulators. Because the FSD contract was awarded on a cost-reimburseable basis, the Navy retained title to the GPRP Alliant produced under the

contract. Sharply disputed by the parties is the extent to which the Navy remained responsible for the incidents of GPRP ownership, specifically the refurbishment, replacement, and repair of the property.

In 1987, Westinghouse Electric Corporation ("WEC") won a competitively awarded contract to become a second source, or "follower," for the manufacture of the MK50 torpedo. Thereafter, the Navy paid Alliant to provide WEC with the necessary training and technology to produce the MK50, including a technical data package containing Alliant's GPRP drawings. The equipment subsequently developed by WEC for MK50 production was funded as "Production Special Tooling and Production Special Test Equipment" ("PST/PSTE").[1] Because the PST/PSTE was produced under a fixed-price contract, title in the PST/PSTE equipment vested in the contractors. Under Navy policy, contractors may recover the cost of producing PST/PSTE equipment by amortizing the equipment over future noncompetitive and competitive procurements. Also, all the incidents of ownership, including refurbishment, replacement, and repair, are the responsibility of the PST/PSTE owner.

Both parties were awarded contracts under the initial low-rate initial production ("LRIP") contracts, LRIP I and LRIP II. Then, in 1990, the Navy held the first competition between Alliant and WEC for LRIP III, a contract for the production of 265 MK50 torpedoes. LRIP III awards were based on an evaluation of: (1) the offered price; (2) a PST/PSTE amortization calcula-

tion; and (3) a "rental equivalent factor" based on the amount of GPRP proposed.[2]

The so-called "rental equivalent factor," mandated by the regulations in certain circumstances, is intended to address and eliminate the possible advantages accruing to a bidding contractor by virtue of its exclusive, rent-free access to GPRP. See 48 C.F.R. § 45.201 (1992). Thus, the bid of a contractor with GPRP is adjusted upward by this factor to account for any advantage the contractor reaps from using GPRP to perform the contract.[3]

The so-called "PST/PSTE amortization calculation" is the means by which a contractor recovers the cost of PST/PSTE produced in connection with current or prior contracts. The extent to which either the PST/PSTE amortization calculation or the GPRP rental equivalent factor is applied to a competitor's bid depends upon the mix of equipment an offeror intends to use to perform the contract. An offeror whose bid relies on GPRP rather than PST/PSTE would incur a higher GPRP factor than a competitor relying on PST/PSTE. In the instant case, because most of WEC's special equipment produced for the performance of the MK50 contracts was PST/PSTE, WEC's bids on LRIPs I–IV were more greatly affected by the amortization increase[4] than by the rental equivalent factor. Alliant's bids in LRIPs I–IV, on the other hand, were more substantially affected by the GPRP rental equivalent factor than the amortization calculation because Alliant's proposed special equipment was predominantly GPRP. By the time of LRIP V, the contract in issue, both parties had fully re-

---

1. The parties dispute the extent to which the equipment WEC developed as a result of this information transfer is actually interchangeable with the Alliant GPRP. Alliant contends that the equipment is "functionally equivalent." WEC, on the other hand, contends that its PST/PSTE equipment is generally less sophisticated and productive than Alliant's GPRP, owing chiefly to the limited nature of the directions provided by Alliant.

2. Ultimately, the Navy issued a split award for LRIP III, awarding 160 torpedoes to WEC and 100 torpedoes to Alliant. Using the same evaluation plan, the Navy awarded all of LRIP IV to Alliant.

3. The "rental equivalent factor" was not applied to all of the GPRP involved under the contract because the costs of certain items could not be accurately determined. This list of excluded items was developed by mutual agreement of Alliant, WEC, and the Navy.

4. Under the PST/PSTE amortization scheme, the PST/PSTE costs for LRIP were funded so that 50% of the costs were recovered on the LRIP I contract and the remaining 50% was to be amortized over the balance of LRIP contracts II–IV. Similarly, the PST/PSTE costs for LRIP II were to be funded so that 50% of the costs were recovered under the LRIP II contract and the remaining 50% over the balance of contracts III and IV.

covered their PST/PSTE costs through amortization. Therefore, no amortization calculation was involved in LRIP V.

LRIP V, the Navy's third competition under the MK50 program and the source of the current controversy, was held from the spring of 1993 to September 1993. In February of 1993, the PCO provided Alliant and WEC with a draft version of the LRIP V Request for Proposal ("RFP"). In this draft version, LRIP V's evaluation scheme, like that of LRIPs III and IV, included a rental equivalent factor for all GPRP involved. Alliant responded to this draft RFP by letter in March 1993, recommending deletion of the GPRP evaluation factor. According to Alliant, because both contractors' special equipment was functionally equivalent and had been paid for by the government, no competitive advantage accrued to Alliant based on its access to GPRP. Consequently, Alliant contended, application of a rental equivalent factor was inappropriate and unfairly disadvantaged Alliant. Alliant accordingly requested elimination of the GPRP rental equivalent factor from the RFP altogether or, in the alternative, the addition of nineteen items of GPRP to the GPRP exclusion list.[5] The Navy reviewed Alliant's concerns, but elected not to eliminate the GPRP rental equivalent factor or to alter the evaluation methodology.

Prior to the commencement of bidding, the Navy asked the offerors to provide corporate-level commitments to submit proposals in conformance with the RFP without exception or qualifying conditions. Alliant claims it then found itself in a difficult position. The Navy advised Alliant that it could follow the established channels for a formal objection, but warned that such a delay created a risk that funding for the MK50 program would be lost. Alliant contends it reasonably viewed this risk to be substantial. It further points out that since the MK50 program was deleted from the government's fiscal year 1994 budget, any delay caused by an Alliant

challenge to the RFP might result in the diversion of the 1993 MK50 funding to another program. Faced with this prospect, Alliant decided against a challenge to the RFP. Although Alliant stated that it "still believe[d] the RFP include[d] an inequity," Alliant provided its corporate-level commitment to propose to the terms and conditions of the RFP without exception.

Alliant and WEC submitted their bids on LRIP V in June 1993. The final evaluated prices for each of the offerors were the following:

| | Alliant | WEC |
|---|---|---|
| Price | $70,124,512 | $70,172,000 |
| GPRP | 259,241 | 207,109 |
| Decrement [6] | (7,038,375) | (7,037,911) |
| Evaluated Price | $63,345,378 | $63,341,198 |

On September 9, 1993, the Navy awarded the LRIP V contract to WEC, which had the lowest evaluated price. Absent the GPRP rental equivalent factor, however, Alliant would have had the lowest evaluated price. Alliant, objecting to the Navy's inclusion of the GPRP factor and its disparate impact on Alliant, brought this suit for injunctive relief.

### III.

Judicial review of agency contract award decisions is based on the Administrative Procedure Act, 5 U.S.C. § 704 *et seq.* (the "APA"). Although bidders have standing to challenge government procurement decisions in federal district court, this judicial review should not unnecessarily interfere in the procurement process. *See Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970). In reviewing contract awards, courts may set aside the awards only if they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In a disappointed bidder case, the losing offeror bears the heavy burden of establishing "by clear

---

5. In Alliant's view, this addition to the GPRP exclusion list was warranted because the nineteen items are functionally equivalent. The Navy disputes this characterization and further contends that the list of nineteen items actually represents nineteen "categories" of equipment, containing over 500 line items in the bid.

6. Both offerors' proposals allowed them to receive the maximum decrement of 10%. The decrement is not at issue in the case.

and convincing evidence that there was no rational basis for the agency's decision or that the procurement involved a clear and prejudicial violation of the applicable statutes or regulations." *Atlantic Research Corp. v. Department of Air Force,* 716 F.Supp. 904, 907 (E.D.Va.1989); *see also Newport News Shipbuilding & Dry Dock Co. v. United States Dept. of Navy,* 960 F.2d 386, 392 (4th Cir.1992). Given this stringent standard, the scope of judicial review is limited. Courts may not substitute their own judgment, but rather must defer to the agency, provided there is a rational basis for the agency's action. *See Atlantic Research Corp.,* 716 F.Supp. at 908. It is through the lens of these principles that the claims at issue must be viewed.

## IV.

The essential question presented is whether the PCO's decision to apply a GPRP rental equivalent factor under LRIP V was arbitrary, capricious, an abuse of discretion, or contrary to law. Analysis of this question properly focuses on the two determinations central to the PCO's decision: (i) that a competitive advantage accrued to offerors holding GPRP and (ii) that this advantage

7. FAR 45.201(a) states in pertinent part that: The Contracting Officer shall, to the maximum practical extent, eliminate competitive advantage accruing to a contractor possessing Government Production and research property (see 45.301). This is done by (1) adjusting the offers of those contractors by applying, for evaluation purposes only, a rental equivalent factor or, (2) when adjusting offers is not practical, by charging rent for using the property....

8. The Navy contends that the PCO also made the factual determination that the application of the GPRP rental equivalent factor was mandated because the subcontractors selected by the parties would affect the mix of GPRP. This determination, however, is not relevant to the instant dispute. Alliant does not contend that it lost the contract because of the application of the GPRP rental equivalent factor to the subcontractors' proposed GPRP. Rather, Alliant objects to the application of the GPRP rental equivalent factor to Alliant's GPRP because it claims this GPRP is "functionally equivalent" to WEC's PST/PSTE.

9. Alliant challenges all explanations of the PCO's determinations in this matter as post-hoc rationalizations. Although reviewing courts generally

triggered the application of the rental equivalent factor mandated by 48 C.F.R. § 45.201.[7]

In deciding that a competitive advantage accrued to holders of GPRP under LRIP V, the PCO necessarily made two predicate determinations, one factual in nature and one legal in nature.[8] Factual determinations of PCOs are treated deferentially by courts, and must be upheld unless they are found to be arbitrary, capricious, or an abuse of discretion. *See Newport News Shipbuilding,* 960 F.2d at 392. Legal determinations, however, are not entitled to this deferential treatment; rather, they are accorded *de novo* review. *See Commercial Energies, Inc. v. United States,* 929 F.2d 682, 684 (Fed.Cir.1991).

The factual determination at issue is the PCO's finding that Alliant's GPRP was not functionally equivalent to WEC's PST/PSTE.[9] In reaching this conclusion, the PCO considered various factors and made technical judgments appropriately entitled to deferential judicial review. Nothing in the record suggests that the PCO's determination resulted from a lack of adequate inquiry or a consideration of inappropriate factors. Nor does the record disclose any other basis for concluding that the PCO's determination

may not rely solely on litigation affidavits providing post-hoc rationalizations for an agency's actions, *see Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), such affidavits may be used to provide additional explanations of the agency's actions. *See Lewis v. Babbitt,* 998 F.2d 880, 882 (10th Cir.1993); *Asarco, Inc. v. U.S. Environmental Protection Agency,* 616 F.2d 1153, 1159 (9th Cir.1980); *Applications Research Corp. v. Naval Air Development Center,* 752 F.Supp. 660, 667 (E.D.Pa. 1990). Other courts have held that review of the whole record is proper, and that "the Court need not determine whether the reasons are post hoc, but must determine whether the record supports the finding that the CO had a 'rational basis' for his decision." *Ace-Federal Reporters, Inc. v. FERC,* 734 F.Supp. 20, 24 (D.D.C.1989). Here, the Court finds that the record does support a finding that the PCO had a rational basis for his decision, and the affidavits of Stephen G. Facini, the procuring contracting officer of LRIP V, and Alan M. Knobler, Deputy Program Manager for the MK50 torpedo, merely provide elucidation of the bases for the PCO's decision.

was arbitrary, capricious, or an abuse of discretion. As such, this determination must be upheld. *See Newport News Shipbuilding,* 960 F.2d at 392.

■ The PCO's second predicate determination was that a competitive advantage accrued to Alliant because the government was responsible for the repair, refurbishment, and replacement of GPRP resulting from normal wear and tear. This determination is legal in nature because it hinges on the PCO's interpretation of a FAR. Therefore, this determination deserves *de novo* scrutiny.

Responsibility for the repair, replacement, and refurbishment of GPRP is governed by 48 C.F.R. § 52.245–2, which regulates the treatment of government property under fixed-price contracts. Subsection (e) of this regulation concerns "property administration." [10] Subsection (e)(3) provides generally that the government must replace damaged government property where it has assumed the risk to do so in the contract. The equally general corresponding contractor obligation appears in subsection (e)(4), which states that "[r]epair or replacement of property for which the Contractor is responsible shall be accomplished by the Contractor at its own expense." [11] Neither of these subsections is dispositive; neither answers the question of which party bears the risk of loss or damage to GPRP. Rather, the answer to this question is found in 48 C.F.R. § 52.245–2(g), titled "Risk of loss," which provides that "the Contractor is not responsible for reasonable wear and tear to Government property or for Government property properly consumed in performing this contract." Because subsection (g) clearly establishes that the Government bears the risk of loss for damage resulting from reasonable wear and tear, subsection (e)(3) then mandates that the Government shall be responsible for any repair or replacement occasioned by such damage, either by paying for the repairs or replacements directly or by making an equitable adjustment to the contract.[12] This directly benefits contractors with GPRP, who do not have to factor into their contract bids any costs for repair, refurbishment, and replacement of GPRP attributable to normal wear and tear.[13] Given this, the PCO correctly determined that a competitive advantage accrued to competitors possessing GPRP.

Alliant contends that the PCO misreads subsection (g). In Alliant's view, that provision does not make the government responsible for the repair, replacement, and refurbishment of GPRP damaged through normal wear and tear, but only protects contractors against liability to the government if such damage occurs. In support of this contention, Alliant cites two decisions. *See DWS, Inc.,* ASBCA Nos. 29866, 31129, 91–2 BCA ¶ 23,727, 118,825 (holding, under the standard Government Property clause incorporating 48 C.F.R. § 52.245–2, that the contractor was "liable for damage to the equipment . . . *beyond* that caused by ordinary (or fair) wear and tear," and upholding that part of

---

**10.** 48 C.F.R. § 52.245–2(e)(3) reads as follows:

(3) If damage occurs to Government property, the risk of which has been assumed by the Government under this contract, the Government shall replace the items or the Contractor shall make such repairs as the Government directs. However, if the Contractor cannot effect such repairs within the time required, the Contractor shall dispose of the property as directed by the Contracting Officer. When any property for which the Government is responsible is replaced or repaired, the Contracting Officer shall make an equitable adjustment. . . .

**11.** 48 C.F.R. § 52.245–2(e)(4) reads as follows:

"The Contractor represents that the contract price does not include any amount for repairs or replacement for which the Government is responsible. Repair or replacement of property for which the Contractor is responsible shall be accomplished by the Contractor at its own expense."

**12.** The provisions describing equitable adjustments are found in 48 C.F.R. § 52.245–2(h). Subsection (h)(4) states that the Government cannot be held liable to suit for breach of contract for "[f]ailure to repair or replace Government property for which the Government is responsible." Equitable adjustments, however, are available in such circumstances, under subsection (e)(3). Because damage to GPRP caused by normal wear and tear is property for which the Government is responsible, contractors can receive equitable adjustments for repair or replacement of such property.

**13.** Of course, contractors must bear the costs of repair or replacement of GPRP occasioned by the contractor's misuse of the equipment or negligence.

the deduction from the contract price the government had taken for damage to government property not attributable to wear and tear); *Saudi Building Technic General Contracting Co./Erectors, Inc. (Joint Venture)*, ENGBCA No. 5170, 86–2 BCA ¶ 18,761 at 94,495 (holding that the contractor was liable for shortages in the property returned to the government under the Government property clause, *absent evidence* that the shortages resulted from ordinary wear and tear).

Alliant's reliance on these cases is misplaced. Neither decision holds that subsection (g) serves only to protect contractors from liability to the government for ordinary wear and tear damage. At most, the decisions stand for the uncontroversial proposition that contractors are liable to the government for damage to GPRP *not* attributable to normal wear and tear. Beyond this, however, the decisions, closely read, support the PCO's finding that subsection (g) makes the government responsible for the repair, replacement, and refurbishment of government property consumed through normal wear and tear. Thus, *DWS, Inc.*, does not hold that contractors must repair or replace GPRP. To the contrary, the contractor there successfully billed the government for certain repairs undertaken on government furnished property and received a stipend of $4,000 per month from the government to cover the maintenance and repair of other government furnished property. 91–2 BCA ¶ 23,727 at 118814 & 118818. Similarly, in *Saudi Building,* the contractor, over the course of contract performance, had returned broken or damaged items of government property and had received replacement items from the Government at no cost. 86–2 BCA ¶ 18,761 at 94496.

In sum, these decisions, as well as a fair reading of subsection (g)'s plain language, support the PCO's determination that the government is responsible for the repair, replacement, and refurbishment of GPRP damaged through normal wear and tear. It follows that this determination is not contrary to law. And it further follows that the PCO correctly concluded that a competitive advantage accrued to holders of GPRP, since they would not have to account for the costs of repair, replacement, and refurbishment to GPRP resulting from normal wear and tear in their bids for LRIP V.

■ Having found that a competitive advantage accrued to holders of GPRP under LRIP V, the PCO next turned to 48 C.F.R. § 45.201(a) to determine how to treat this advantage. This regulation mandates the application of a rental equivalent factor to offerors' bids whenever GPRP creates a competitive advantage. Accordingly, the PCO applied the GPRP rental equivalent factor to both parties' proposed GPRP. Because the PCO's decision to include a rental equivalent factor under § 45.201(a) cannot be characterized as arbitrary, capricious, an abuse of discretion, or as a violation of applicable law, it is upheld.

Alliant also challenges the PCO's refusal to add the nineteen items of GPRP suggested by Alliant to the existing, agreed-upon exclusion list. In deciding whether to include the nineteen items, the PCO considered the rationale for including specific items on the exclusion list. He determined that all items on the exclusion list fell into one of two categories: (1) GPRP for which a rental equivalent could not practically be calculated or (2) identical GPRP held by both parties.[14] Given this, the PCO determined that the nineteen items of GPRP proposed for exclusion by Alliant did not fall into either category. Accordingly, the PCO correctly declined Alliant's request to add these items to the exclusion list. This factual determination is entitled to deferential judicial review. Given this, and because the record discloses no basis for concluding that this determination was arbitrary, capricious, an abuse of discretion or contrary to law, it must be upheld.

## V.

■ The equitable doctrines of estoppel and waiver provide an independent basis for affirming the PCO's decisions in this matter. The Fourth Circuit's succinct definition of these doctrines is dispositive here: "In order

---

14. The type of GPRP considered "identical" was either equipment manufactured by Alliant and then provided directly to WEC or GPRP found in facilities shared by both offerors.

to support estoppel or waiver, a party must have been induced to rely on certain facts, and must have done so to [its] detriment." *American Hardware Mut. Ins. Co. v. BIM, Inc.*, 885 F.2d 132, 138 (4th Cir.1989) (quoting *Mundy v. Arcuri*, 165 W.Va. 128, 267 S.E.2d 454, 456–57 (1980)).

The instant facts fit squarely within this definition. On receipt of the draft RFP, Alliant had notice that the Navy intended to apply the GPRP rental equivalent factor in LRIP V. By the time the Navy sought Alliant's corporate-level commitment to propose to the terms and conditions of the RFP without exception, Alliant also had notice that its challenges to the inclusion of the GPRP rental equivalent factor had failed and that the Navy was proceeding with the procurement. At this point, Alliant had the option of pursuing its objection to the RFP by way of filing a protest with the General Accounting Office ("GAO").[15] Alliant chose not to pursue this course, but elected instead to acquiesce in the Navy's request to provide a corporate-level commitment to bid on the RFP without exception. In other words, Alliant made a business decision to proceed with the RFP as promulgated; it gambled and lost. Having waived its opportunity to protest the RFP while the possibility of changing the terms still existed, Alliant cannot now protest the award simply because its gamble did not pay off.

 It is important to note that Alliant's claim is not barred here for failure to exhaust remedies. Parties challenging procurement awards are not required to exhaust administrative remedies before being heard in federal district court. As stated in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 875 n. 19 (D.C.Cir.1970), "[t]he regulations relating specifically to bid protests are ... permissive rather than mandatory in nature...." Accordingly, an appeal to the GAO is not a prerequisite to court review. *Id.* at 876. Thus, estoppel and waiver operate here, not exhaustion of administrative remedies. And estoppel and waiver arise because the Navy explicitly asked Alliant to waive its objection to the inclusion of the GPRP rental equivalent factor and Alliant agreed, first by issuing its corporate-level commitment to propose to the RFP without exception and later by submitting its bid. Alliant now contends that it had no choice but to give its corporate-level commitment to the RFP, submit its bid, and hope for the best. This position is unpersuasive. Alliant plainly had choices, including specifically a GAO protest. Even accepting Alliant's claim that it had no choice but to issue its corporate-level commitment,[16] Alliant could still have sought GAO review once the Navy issued the LRIP V solicitation.[17] Alternatively, Alliant could have refused to provide the corporate-level commitment to bid without exception. But what Alliant cannot do is to have it both ways: It cannot assure the Navy that it will bid without exception and then file a suit when its bid fails.

Well reasoned authority supports this result. It is well established that bidders who fail to make timely protests regarding improper bid solicitations waive their ability to protest. *See Saco Defense System Div. v.*

---

15. Under GAO regulations, 4 C.F.R. § 21.1(a), "[a]n interested party may protest to the [GAO] a solicitation issued by or for a federal agency for the procurement of property or services, or the proposed award of such a contract." These regulations further provide that "[p]rotests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals." 4 C.F.R. § 21.-2(a)(1).

16. Alliant contends that, had it not issued its corporate-level commitment to the RFP, the Navy could have entered into a sole source procurement with WEC. There is no evidence to indicate that this is the case, and the Navy flatly

disputes the allegation. Alliant also argues that it could not file a GAO protest until after the bid solicitation had been issued. *See* 4 C.F.R. § 21.-1(a). The Navy's unequivocal decisions to include the GPRP rental equivalent factor and not to expand the exclusion list, however, were final decisions ripe for GAO consideration even though made prior to the issuance of the RFP.

17. Alliant's argument that such a challenge could have resulted in a loss of MK50 funding is as problematic as it is irrelevant. Preservation of funding can never be a valid excuse to proceed with a putatively illegal or improper RFP. Similarly, preservation of funding is no justification for delaying or withholding the assertion of an objection.

*Weinberger,* 806 F.2d 308 (1st Cir.1986); *Airco, Inc. v. Energy Research and Dev. Admin.,* 528 F.2d 1294 (7th Cir.1975).[18] Alliant seeks to distinguish these cases, noting that the disappointed bidders involved, unlike Alliant, never questioned or complained about the alleged inequities in the challenged solicitations. This distinction, far from supporting Alliant, underscores the appropriateness of the waiver-estoppel defense in the instant case. Here, Alliant had knowledge of the alleged defects of the RFP prior to the closing date for receipt of initial proposals and nevertheless affirmatively represented to the Navy a willingness to proceed without objection. Such a knowing and clear waiver presents an even stronger case for waiver and estoppel than the silence exhibited by the parties in *Saco* and *Airco.*

Alliant made a business decision to issue a commitment to propose to the RFP without exception and then to submit a bid to the RFP as promulgated. The Navy reasonably relied on Alliant's commitment to its detriment by proceeding with the award process and incurring substantial costs. Therefore, the standard in *American Hardware* operates here to bar Alliant's claims under the doctrines of estoppel and waiver.

## VI.

For these reasons, the Navy's decision to award LRIP V to WEC was not arbitrary, capricious, an abuse of discretion, or contrary to law and is therefore upheld. Further, Alliant's claims here are barred under the doctrines of estoppel and waiver.

An appropriate order shall issue.

---

**18.** Contrary authority is, if not distinguishable, unpersuasive. In *Health Care Serv. Corp. v. Califano,* 601 F.2d 934 (1979), the Seventh Circuit refused to find waiver in a disappointed bidder case, stating that "[a] general rule that a bidder must assert objections to a bid before the award to avoid waiver would encourage objections that time and events may solve without appeal to higher administrative authority or the courts and would tend to cause unnecessary delays in procurement." *Id.* at 935. To begin with, *Health Care* is plainly distinguishable. Absent there, but present here, is an explicit waiver, an agreement to bid without exception. And moreover, it is unpersuasive to argue, as *Health Care* seemingly does, that it is never incumbent on a bidder to object until after the award because events may render the objection moot and thus earlier assertions of the objection would be inefficient. In some instances, it would surely be more inefficient to invite parties with existing objections to delay assertion of the objections until the award process has been completed and they learn they have lost.